BENTON, Circuit Judge.
After a bench trial, the district court[1] found that Steven C. VonWald, the director of the Minnesota facility in which Philip D. Schaub was incarcerated, was deliberately indifferent to Schaub’s serious medical needs in violation of the Eighth Amendment. The court awarded Schaub $214,000 in compensatory damages and $750,000 in punitive damages. VonWald appeals both the judgment and the award of punitive damages. Having jurisdiction under 28 U.S.C. § 1291, this court affirms.
I.
In 1984, Schaub became a paraplegic at age 21 in a car accident. On November 20, 2002, Schaub pled guilty before Minnesota District Judge Jodi L. Williamson, and was sentenced to serve 180 days in the Olmsted County Adult Detention Center (“ADC”) as part of his sentence. The *910 ADC is a detention facility connected to the County Government Center in Rochester, Minnesota. At the time of Schaub’s confinement, the ADC director was VonWald.
Schaub has several serious medical conditions. Due to the atrophy of his muscles from the chest down, he has very little cushion in his legs and buttocks to protect his feet, legs, coccyx (tail bone), and sacrum (lower back), which easily become bruised or affected by pressure sores. Pressure (bed) sores are lesions caused by unrelieved compression of tissues between bone and surrounding surfaces. Bed sores are slow-healing and can be fatal if untreated. Proper treatment is to relieve pressure by turning the patient at least every two hours, and keeping the wounds free of bacteria and dead tissue (because bacteria grow in dead tissue and can greatly compromise wound healing). Schaub also has edema (an abnormal accumulation of fluid beneath the skin) in his feet, which creates pressure that can exacerbate any bed sores. Treatment requires him to elevate his feet above his head at night in order to drain excess fluid.
Schaub also suffers from severe spasticity — involuntary muscle contractions that cause lower-body muscles to jump and jerk. Because he has sensation down to his knees, his spasticity causes pain and interferes with sleep. The spasticity, which prevents Schaub from sleeping completely flat, is treated by elevating both his legs and upper body with the aid of an adjustable hospital bed. In addition, he has an intrathecal pump under his skin that administers the drug baclofen directly into his cerebral spinal fluid (baclofen dampens the spasticity).
When Schaub came to the ADC in March 2003 to begin his sentence, he was assigned to a handicapped-accessible cell in the work-release unit. In work release, detainees work outside the ADC at regular jobs during business hours, then return for overnight detention. For full-time prisoners, the ADC contracts with the local public health department to staff the ADC medical unit and provide health-care services. Detainees on work release, however, are responsible for their own medical care and may obtain medical care while away from the ADC. Both full-time and work-release detainees are sent to an outside hospital for emergency care. During Schaub’s stay, the medical unit was staffed by nurses during business hours Monday through Friday. A part-time physician was supposed to be present for a half-day twice a week. The medical staff was supervised by Robin G. Molella, M.D., a Mayo Clinic physician working under a contract between the county and the clinic.
Schaub’s handicapped-accessible cell had a privacy wall adjoining the toilet. The toilet had grab bars nearby at an angle, neither horizontal nor vertical. The cell had an emergency call button near the bed, not reachable from the toilet. Immediately upon entering the cell at intake, Schaub notified the sergeant that the cell was inadequate for his needs. Schaub said the toilet was so low that he could fall when transferring between it and his wheelchair, and the shower was unusable because the shower bench was made of hard metal. He also objected to the metal bed common to all ADC cells, which could cause pressure sores.
The sergeant attempted to accommodate Schaub. He was authorized to take an additional two hours of work-release time to go home to shower and use the bathroom (Schaub’s apartment had a shower with a padded seat and hand-held shower-head, and the toilet had a padded seat). The sergeant authorized two mattresses and additional pillows for Schaub’s bed.
A short time after arriving, Schaub developed pressure sores on his legs; the *911 additional pillows were insufficient to raise his legs high enough to drain fluids out of them.[2] Compounding the problem, the bed had no grab bars, so he could not change his body position in order to prevent pressure sores.
During his time at the ADC, Schaub continued to see his regular doctors at the Mayo Clinic while on work release. On April 7, 2003 (one month into his sentence), Dr. Kathryn A. Stolp wrote Director VonWald after treating Schaub for a pressure sore on his heel. She stated:
To prevent skin breakdown, decrease dependent edema (which leads to breakdown of his feet if not controlled), and for spasticity management, he [Schaub] requires a padded toilet seat, adequate accessible shower with padded shower bench, and a mechanism for elevating his legs as well as pressure-relieving mattress on his bed. He cannot sleep completely flat without exacerbating his spasticity. He has now developed a pressure sore on his left heel.
I would appreciate your assessment as to whether his care needs can be met at the jail.... If the above conditions cannot be met, I guess I would advocate for him to be on home electronic monitoring.
The letter was reviewed by Dr. Molella, the physician in charge of ADC health care. She entered notes in Schaub’s file stating that the standards set by Dr. Stolp “will be extremely difficult to reliably provide in ADC,” and that “the bed situation is still suboptimal.” Because Schaub was then in work release and still responsible for his own health care, Dr. Molella did not meet with him or treat him.
On April 29, Schaub broke his femur after falling to the floor while trying to transfer from the toilet to his wheelchair. While he usually used the toilet at his apartment, on this occasion he “felt a deep personal urge,” in the district court’s words. The cell’s only panic button was above the bed, out of his reach. His calls for help went unheard. After ten minutes or so, Schaub was able to pull himself up into the wheelchair and summon the guard. He was released to drive himself to the hospital. Schaub was admitted to the hospital for about a week, and had surgery to place a pin in his upper thigh.
After the fall, his attorney petitioned Judge Williamson for a sentence modification so Schaub could serve the rest of his sentence on electronic home-monitoring. The attorney specifically alleged that the ADC could not adequately meet his physical and medical needs. Schaub filed an affidavit detailing his health issues and the inadequacies of his cell at the ADC. The Olmsted County Attorney’s Office opposed the request. Judge Williamson wrote ADC Director VonWald on May 13, inquiring whether the ADC could adequately accommodate Schaub’s needs. Judge Williamson enclosed Schaub’s affidavit, the April 7 letter from Dr. Stolp to VonWald, and a summary of his condition prepared by Dr. Stolp.
On May 15, Director VonWald wrote Judge Williamson. He said it was his belief that the ADC had addressed all of Schaub’s needs “except the bed issue.” VonWald noted that Schaub was given extra work-release time outside the ADC to address his medical and personal-hygiene issues, and that he had been instructed to *912 bring in a toilet lift for use when he needed to use the bathroom at the ADC. VonWald added:
We also instructed him to bring in whatever mattress and cushions he needed to take care of the lower and upper extremity problems he experiences. Certainly, we don’t have a hospital bed that can be electronically adjusted but we felt that by allowing whatever he thought he needed in mattresses and cushions would fulfill the Doctor’s orders.
... My staff and I are of the opinion, with participation and cooperation from Schaub he can serve out his sentence without his medical condition deteriorating simply because he is staying in the ADC.
On May 16, Judge Williamson denied the request to modify Schaub’s sentence. She appended VonWald’s letter to her order, which incorporated it by reference.
On July 15, Schaub returned to the ADC from home recovery. When he returned, he had a cast on his leg and open pressure sores on his thighs and heels. He was no longer eligible for work release, as he had lost his job. Therefore, he was placed in the general population of full-time detainees, so his medical care was the responsibility of the ADC. VonWald testified that he noticed “first thing in the morning” that Schaub had returned to the ADC and was placed in the general prison population, not in the work-release unit. While VonWald asked his prison staff to ask the medical staff to “check” with Schaub, he did not make any inquiry to the ADC medical staff to find out whether the ADC could fully provide for Schaub’s care (when Schaub was in work-release, he showered at home in a handicapped-accessible shower with a padded bench, performed his bowel care at home on a handicapped-accessible toilet with a padded seat, and had the assistance of his mother with changing his bandages).
On July 16, an ADC nurse evaluated Schaub. She noted that he required a catheter bag, wound dressings, a bed pan, a toilet raiser, a shower chair, risers for his feet and head, and two mattresses until “a new thicker one” could be found (Schaub left the ADC before a thicker mattress was provided). The nurse allowed him to have a sheepskin for his bed. She arranged outside medical appointments for him on July 24 and 25, a week later.
Schaub testified that the additional bedding items he was provided were insufficient to cushion him and elevate his legs high enough to drain. He did not request any further special bedding because he did not know that VonWald had said he could bring in outside materials such as foam wedges, mattresses, or a padded toilet seat, and no member of the ADC staff ever communicated this to him. VonWald testified that while he told his staff to let Schaub bring in additional items, no member of his staff ever said that this information was conveyed to Schaub, and VonWald never followed up. Dr. Molella testified that she did not think at the time that using extra prison mattresses and pillows instead of a pressure mattress was going to fix things, but it was an “attempt” to meet Schaub’s needs.
On July 17, Schaub was seen by Dr. Molella. She noted several pressure sores: a 2.5cm sore on his lower buttock, a 2.5cm sore on his right ankle, and two separate ulcers on his left heel. Dr. Molella also noted a 4cm x 5cm area of pressure on his sacral (lower-back) region, which was red but not ulcerated. Dr. Molella dressed his wounds and wrote in his file:
His ability to reposition himself in bed is extremely limited due to the lack of grab bars of any kind. He has foam wedges *913 in his cell, two mattresses and a sheepskin. While these are improvements, I am not certain they are adequate adaptations to treat the current skin problems, and to address prevention of further problems.
Dr. Molella further recorded that Schaub’s skin breakdown “is a serious issue at this time. Close surveillance and assistance with dressing changes is required.” She indicated that he should be repositioned hourly, and that the ADC may need to provide him a second cell to change the direction he faces (ADC headcount protocols required detainees to keep their heads at one end of the bed, making it impossible for him to switch sides and still be facing toward the door). Schaub was never provided a second cell.
Later that same day, a nurse wrote in Schaub’s file about a plan to locate a commode with arm rails and a shower bench for use in the handicapped shower. If this were unsuccessful, the ADC would offer him the option of showering in the medical facilities on Tuesdays through Fridays. The nurse noted that he might be moved to the handicapped cell in the work-release unit, and that the ADC might have to contact an outside nursing agency for wound care.
According to ADC records, there was no further action or treatment for the next five days. His wounds were not dressed; he was not bathed. Schaub asked for such assistance daily in written notes (“kites”) to ADC staff (these notes are missing due to the ADC’s document-retention policy). At one point, he asked an ADC corrections officer to help change his bandages, but the officer refused as it fell outside his training and responsibilities. Schaub complained about his situation to the deputies and at least one sergeant, to no avail.[3]
On July 22, a nurse from an outside nursing agency assessed Schaub in the presence of an ADC nurse. The nurses noted a “strong odor” from a wound on his ankle, and received telephone approval from Dr. Molella to provide him an oral antibiotic. Schaub was approved for biweekly baths and changing of the dressings on his wounds. He was also approved to have two extra pillows in his cell to elevate his buttocks, lessening the pressure on his coccyx. The ADC nurse wrote that she would try to find a different wheelchair to keep his legs elevated.
On July 23, Schaub was bathed for the first time in eight days, during which he had soiled himself in his clothes several times until a toilet chair was acquired. An ADC nurse examined him and applied new dressings to his left heel, right ankle, and buttocks. The nurse noted a “[l]arge area” of new skin breakdown on his sacral area, and scheduled him to see Dr. Molella the next morning.
On the morning of July 24, Dr. Molella and an ADC nurse examined Schaub. They smelled a strong odor when entering his cell. His right hand was “edematous and red to mid-forearm.” Dr. Molella sent him to an emergency room for evaluation and treatment. According to her notes, since his initial incarceration in work release, his symptoms had worsened and his health had continued to decline. She wrote that in his current state, the ADC could not provide the skin care and other skilled nursing support required to improve and manage his condition. Dr. Molella recommended that he not be returned to the ADC, given the decline in his health while there, but if he must return, not until he was back to his baseline mobility and his skin was fully intact. She noted that if *914 he must be held for security reasons, his condition required an infirmary setting with special bedding and 24-hour nursing support.
On July 24, the same day Schaub was admitted to the hospital, Judge Williamson ordered him released from the ADC until his medical issues were resolved. Four days later, Judge Williamson vacated the remainder of his sentence.
Schaub’s condition continued to decline after being released. The damage from the infected pressure sores on his buttocks extended through the full thickness of the skin to the bone. Multiple surgeries were eventually required to close the wounds. A bone infection resulted in the loss of part of Sehaub’s hip and the head of his femur. All told, his injuries took at least four years to heal and resulted in the loss of much of his upper-body strength because he was bedridden. During this time, he endured significant pain and was unable to work.
Schaub sued Steven C. VonWald, Olmsted County, the ADC, and various ADC employees, alleging constitutional violations under the Eighth Amendment and Monell v. Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). He also alleged violations of the Americans with Disabilities Act. After a bench trial, the district court held that his Eighth Amendment rights were violated by VonWald, who was deliberately indifferent to his serious medical needs from the time he re-entered the ADC after breaking his leg, until sent to the hospital. The district court entered judgment for the defendants on the Monell and ADA claims. The district court awarded Schaub $114,000 for lost wages, $100,000 for pain and suffering, and $750,000 for punitive damages. This appeal followed.
II.
VonWald challenges the district court’s finding that he deliberately disregarded Schaub’s serious medical needs. He further contends that there was insufficient evidence that Schaub’s injuries were caused by the acts of VonWald.
A.
The Eighth Amendment prohibits the infliction of cruel and unusual punishment. “[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.” Helling v. McKinney, 509 U.S. 25, 31, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). To prevail on an Eighth Amendment claim for deprivation of medical care, an inmate must show that the prison official was deliberately indifferent to the inmate’s serious medical needs. Coleman v. Rahija, 114 F.3d 778, 784 (8th Cir.1997). This requires a two-part showing that (1) the inmate suffered from an objectively serious medical need, and (2) the prison official knew of the need yet deliberately disregarded it. Id.; see also Farmer v. Brennan, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); Estelle v. Gamble, 429 U.S. 97, 105, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).
A serious medical need is “one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor’s attention.” Camberos v. Branstad, 73 F.3d 174, 176 (8th Cir.1995). A medical need that would be obvious to a layperson makes verifying medical evidence unnecessary. Hartsfield v. Colburn, 371 F.3d 454, 457 (8th Cir.2004).
Deliberate indifference is equivalent to criminal-law recklessness, which is “more blameworthy than negligence,” yet *915 less blameworthy than purposefully causing or knowingly bringing about a substantial risk of serious harm to the inmate. See Farmer, 511 U.S. at 835, 839-40, 114 S.Ct. 1970. An obvious risk of harm justifies an inference that a prison official subjectively disregarded a substantial risk of serious harm to the inmate. Lenz v. Wade, 490 F.3d 991, 995 (8th Cir.2007). Deliberate indifference must be measured by the official’s knowledge at the time in question, not by “hindsight’s perfect vision.” Id. at 993 n. 1 (quoting Jackson v. Everett, 140 F.3d 1149, 1152 (8th Cir.1998)).
Whether an inmate’s condition is a serious medical need and whether an official was deliberately indifferent to the inmate’s serious medical need are questions of fact. Coleman, 114 F.3d at 785. After a bench trial, this court reviews the district court’s findings of fact for clear error. Lenz, 490 F.3d at 994; see also Fed.R.Civ.P. 52(a). A finding is clearly erroneous when “although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.” Anderson v. City of Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) (quoting United States v. U.S. Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948)). This standard does not entitle a reviewing court to reverse the finding of the trier of fact simply because it would have decided the case differently if finding the facts de novo. Anderson, 470 U.S. at 573, 105 S.Ct. 1504. If the district court’s account of the evidence is plausible in light of the record viewed in its entirety, this court may not reverse it even though convinced this court would have weighed the evidence differently if sitting as the trier of fact. Id. at 573-74, 105 S.Ct. 1504. Where there are two permissible views of the evidence, the factfinder’s choice between them cannot be clearly erroneous. Id. at 574, 105 S.Ct. 1504. When findings are based on witness credibility, Rule 52(a) demands even greater deference to the trial court’s findings. Id. at 575, 105 S.Ct. 1504.
The district court found that VonWald was deliberately indifferent to Schaub’s serious medical needs from the time he re-entered the ADC on July 15 until transported to the hospital on July 24. The court found that treatment of his pressure sores, edema, and spasticity required close observation, regular dressing of his wounds, a mechanism sufficient to elevate his legs, a pressure-relieving mattress on his bed, and grab bars to allow repositioning himself in bed. The district court concluded that Schaub’s condition was sufficiently serious to constitute a serious medical need. The letter from Dr. Stolp and the medical staffs observations (documenting new areas of skin breakdown) were sufficient verifying medical evidence of the escalating seriousness of his condition if not treated properly. Regardless, the district court found that his oozing sores and the smell of infection made his serious medical needs “more than obvious” to a layperson. See Hartsfield, 371 F.3d at 457. Based on the record here, the district court did not clearly err in finding that Schaub’s condition constituted a serious medical need.
The district court then found that VonWald was aware of and deliberately disregarded Schaub’s serious medical needs by ignoring the concerns raised by his doctors and Judge Williamson. VonWald objects that he played no role in his care and treatment other than to approve a request to allow an outside nursing agency to assist with Schaub’s care. He further argues that Schaub failed to offer verifying medical evidence that VonWald ignored an acute or escalating condition or that delays adversely affected his prognosis. See Dulany v. Carnahan, 132 F.3d *916 1234, 1243 (8th Cir.1997) (finding that the objective portion of the deliberate indifference standard “requires a showing of ‘verifying medical evidence’ that the defendants ignored an acute or escalating situation or that delays adversely affected the prognosis given the type of injury.”).
An official such as VonWald may be held liable under the Eighth Amendment if he knows that an inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it. Farmer, 511 U.S. at 847, 114 S.Ct. 1970. The factual determination that an official had the requisite knowledge of a substantial risk may be inferred from circumstantial evidence, or from the very fact that the risk was obvious. Id. at 842, 114 S.Ct. 1970. The letter to VonWald from Dr. Stolp — also forwarded to him by Judge Williamson— explained that Schaub had pressure sores, and that his condition required: 1) a padded toilet seat; 2) a handicapped-accessible shower with padded shower bench; 3) a mechanism for elevating his legs in bed; and 4) a pressure-relieving mattress on his bed. This was sufficient to find VonWald was aware of Schaub’s medical needs.[4] See id. at 842-43, 114 S.Ct. 1970 (where the evidence shows that a substantial risk to the inmate’s health was well-documented and the circumstances suggest that the defendant-official was exposed to information about the risk and thus must have known about it, then such evidence is sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk). Further, VonWald was aware almost immediately upon Schaub’s arrival at the ADC on July 15 that he had been placed in the general population of full-time detainees instead of in work release. VonWald thus knew that Schaub’s medical care was the sole responsibility of the ADC.
VonWald claims that there was no evidence that he knowingly disregarded Schaub’s medical needs. However, the record shows that VonWald falsely assured a judge of his ability to handle Schaub’s medical care. Judge Williamson explicitly asked whether the ADC could accommodate Schaub’s needs. VonWald wrote back that Schaub had been instructed “to bring in whatever mattress and cushions he needed,” and that “by allowing whatever he thought he needed in mattresses and cushions,” the ADC would fulfill his needs. The district court found this statement by VonWald to be a falsehood that created a false impression with Judge Williamson. VonWald himself testified that he had no intention of providing a pressure-relieving mattress for Schaub, as the ADC’s fire-prevention protocols did not allow outside mattresses.[5] The district court found that VonWald’s wrongful assurances to Judge *917 Williamson showed deliberate indifference, because VonWald knew the ADC could not fulfill Schaub’s needs (the fact that the ADC could not accommodate his known needs was an explicit finding of fact by the district court).
VonWald took no steps to assure himself that the ADC could in fact handle Schaub’s medical needs either before his return to the ADC or upon learning that he had been placed in the general population of full-time detainees (instead of work release). Prior to Schaub’s return, VonWald was on notice that the ADC could not accommodate his needs. Dr. Molella testified that her response to Dr. Stolp’s letter was: “I absolutely commented, and shared with the jail staff that, in fact, they had not met the standard that had been requested by the physician.” When asked about her advice to VonWald in light of the lack of adequate bedding, padded seats, or a way of keeping pressure off Schaub’s wounds, Dr. Molella testified: “What advice I gave to director VonWald, as I recall it, was that I believe that electronic home monitoring would be a simpler choice. That’s what I told him.” She also testified that the ADC medical staff received no advance notice that Schaub was being returned to the ADC on July 15, and that neither VonWald nor any other ADC staff member specifically asked her whether the ADC could medically care for Schaub.
When VonWald learned on July 15 that Schaub had returned to the full-time detainee population and his medical care was the sole responsibility of the ADC, he knew his statements to Judge Williamson were clearly no longer true — VonWald’s letter had assumed that much of Schaub’s medical needs would be met by his outside physicians and ability to go home for bathing and bowel care. After all, the context of VonWald’s response to the judge was a petition for Schaub — a work-release detainee with access to outside physicians and a handicapped-accessible home by day — to serve out the remainder of his sentence on electronic home-monitoring because the ADC could not meet his medical needs during the limited time each day he was in the ADC.
In fact, other than VonWald’s wrongful statement to the judge that Schaub could bring in a pressure mattress, most of the “accommodations” the ADC made consisted of letting him take extra time at home to do his bathing in a handicapped-accessible shower with padded shower bench, and his bowel care on a handicapped-accessible toilet with padded toilet seat (not to mention that at home Schaub’s mother assisted him with cleaning and dressing his pressure sores). Yet VonWald never made any direct inquiries with the ADC medical staff to assure himself the ADC could adequately care for Schaub’s medical needs on a full-time basis. An obvious risk of harm justifies an inference that a prison official subjectively disregarded a substantial risk of serious harm to the inmate. Lenz, 490 F.3d at 995.
Although VonWald asked his staff to ask the medical staff to “check” with Schaub upon his arrival, he did not make any inquiry to the ADC medical staff to find out whether the ADC could fully provide *918 for his care. VonWald testified that he normally “would have” made such an inquiry, but had no recollection of doing so. He testified that the person he normally “would have” made such an inquiry to was Captain Stacy Sinner, who was responsible for overseeing the ADC staff. Captain Sinner, in turn, testified that she had no recollection of any conversation with VonWald or Dr. Molella regarding Schaub, other than a conversation in which VonWald told her that Judge Williamson had contacted him and that “the judge wanted us to work very diligently to, umm, ah, to accommodate Mr. Schaub so that he could be in jail.” The district judge, in the best position to evaluate VonWald’s credibility, made a factual finding that “there was not a single indication of an inquiry of any sort by senior administrative staff in the facility.”
Despite VonWald’s knowledge of Schaub’s needs, he never checked with the ADC medical staff at any time after Schaub’s return to determine whether he was receiving the medical treatment Dr. Stolp ordered — when any inquiry into Schaub’s treatment (or an examination of his medical file) would have revealed that his treatment was entirely insufficient.[6] VonWald took no steps to acquire a pressure-relieving mattress for Schaub (nor did he ever intend to). VonWald never followed-up to see if Schaub was aware he could bring in his personal foam wedges. VonWald took no steps to see if Schaub had access to a handicapped-accessible shower or was otherwise being bathed— VonWald testified that while he was aware that other ADC detainees have access to a shower daily, with regard to Schaub, “I just assumed — I gave it to the medical team, and I assumed that those problems were going to be taken care of.” When asked if he ever followed up, he answered “No.” Finally, VonWald took no steps to see if Schaub had access to a handicapped-accessible toilet with a padded seat. While “a warden’s general responsibility for supervising the operations of a prison is insufficient to establish personal involvement,” Ouzts v. Cummins, 825 F.2d 1276, 1277 (8th Cir.1987), VonWald was personally involved in the decision to return Schaub to the ADC and was responsible for seeing that he was adequately cared for once his needs were brought to VonWald’s attention. See Langford v. Norris, 614 F.3d 445, 460 (8th Cir.2010) (noting that even though defendant prison supervisor was “not a medical doctor and does not personally treat inmates’ medical needs, ... [tjhere is no doubt that [defendant] has a constitutional duty to see that prisoners in his charge who need medical care receive it.”); see also West v. Atkins, 487 U.S. 42, 56, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988) (“Contracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody.”).
Meanwhile, Schaub’s condition was rapidly deteriorating. Schaub had new areas of skin breakdown in addition to his existing pressure sores, some of which were infected; his dressings were not being adequately changed; he was not bathed; he had no grab bars to reposition himself in bed.[7] During this time, he went *919 five days without being treated by any medical personnel — the five days after Dr. Molella characterized Schaub’s pressures sores as “a serious issue ... [requiring] [c]lose surveillance and assistance with dressing changes.”[8] This constituted a need for medical attention that would have been obvious to a layperson, making submission of verifying medical evidence unnecessary. See Roberson v. Bradshaw, 198 F.3d 645, 648 (8th Cir.1999); Boyd v. Knox, 47 F.3d 966, 969 (8th Cir.1995) (noting that a delay in treatment, coupled with knowledge that an inmate is suffering, can support a finding of an Eighth Amendment violation). The district court’s finding that VonWald was subjectively aware of Schaub’s needs and deliberately disregarded them was not clearly erroneous.
The dissenting opinion raises other arguments: 1) Schaub never asked to see a doctor; 2) Dr. Molella did not think Schaub’s medical needs were being ignored during the time in question; and 3) VonWald had no way of knowing that Schaub was experiencing serious harm because he had no interaction with Schaub.
Schaub testified that he did not specifically ask to see a doctor in his daily notes to the nursing staff, where he did ask to be bathed and have his wounds cleaned and dressings changed. This fact supports Schaub’s point that he suffered from a need for medical attention that was obvious to a layperson. Schaub, a 46-year-old who had been a paraplegic for nearly 20 years, was suffering not for the first time from bed sores. Proper treatment required regular repositioning, regular baths, and to have his wounds cleaned and dressed before becoming so infected they could be smelled across a room — activities well within the ken of the nursing staff to whom he directed his daily kites. Moreover, Dr. Molella testified that it was the nurses’ responsibility to assist with the dressing changes.
The dissenting opinion notes Dr. Molella’s “watchful waiting” approach, arguing that if she thought the ADC could adequately meet Schaub’s ongoing needs and the medical requirements in Dr. Stolp’s letter, there was no reason for VonWald to suspect that the ADC could not handle his *920 needs. However, this argument ignores much of Dr. Molella’s testimony — that she was trying to do the best she could after VonWald had told her Schaub was going to remain in the ADC. According to Dr. Molella, before Schaub’s re-entry to the ADC she “absolutely commented, and shared with the jail staff that, in fact, they had not met the standard that had been requested by the physician.” She testified that her advice to VonWald was that Schaub be placed on electronic home-monitoring instead of returning to the ADC, and that no one asked her, when Schaub returned, whether the ADC could handle his full-time care. She testified that upon his return, “[tjhere were health accommodations that we were attempting to provide for him that I don’t believe we had been able to provide for him because of the barriers to obtaining them, whether it was wheels on the shower chair or a means to better access his call button or those kinds of concerns that he had asked us about, and we were working on trying to meet those needs while he was there.” (emphasis added).
The dissenting opinion is correct that VonWald had no personal interaction with Schaub. However, VonWald was aware of his serious medical needs and deliberately disregarded them by falsely assuring a judge the ADC could handle his needs and then failing to take the proper steps to insure that the ADC could provide adequate care. A prison official may be liable if the official has actual knowledge of a substantial risk of serious harm. See Kahle v. Leonard, 477 F.3d 544, 551 (8th Cir.2007) (noting that a prison official need not believe that serious harm will actually befall an inmate or have actual knowledge that the inmate is experiencing serious harm: “it is sufficient that the official knows of a substantial risk that the inmate will suffer serious harm.”). When VonWald saw Schaub return to the special management unit, it was incumbent upon him to take the necessary steps to provide Schaub adequate medical care, or inform Judge Williamson that the ADC could not accommodate his full-time care; VonWald’s inaction constituted deliberate indifference. See Farmer, 511 U.S. at 842, 114 S.Ct. 1970 (noting that in an Eighth Amendment claim, “it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm.”) (emphasis added); Meloy v. Bachmeier, 302 F.3d 845, 849 (8th Cir.2002) (a supervisor is liable for an Eighth Amendment violation “when the supervisor’s corrective inaction constitutes deliberate indifference”); Boyd, 47 F.3d at 968 (noting that a supervisor can incur § 1983 liability by turning a blind eye to an Eighth Amendment violation).
The clear-error standard of review governs this appeal. Ample evidence supports the district court’s findings of fact that 1) the ADC could not accommodate Schaub’s known medical needs; 2) VonWald knew the ADC could not accommodate his known medical needs; 3) VonWald misrepresented the ability of the ADC to care for his needs to a judge; and 4) VonWald failed to take adequate steps to provide Schaub medically-necessary care or have him removed from the full-time medical care of the ADC. Under the clear-error standard of review, this court may not reverse the findings of the district court simply because it would have weighed the evidence differently or decided the case differently if sitting as the trier of fact. Anderson, 470 U.S. at 573, 105 S.Ct. 1504. If there are two permissible views of the evidence, the factfinder’s choice between them cannot be clearly erroneous. Id. at 574, 105 S.Ct. 1504. When findings are based on witness credibility, as they are here, Rule 52(a) demands deference to the trial court’s findings. *921 [9] Id. at 575, 105 S.Ct. 1504.
B.
VonWald argues that there was no evidence that he caused any of Schaub’s injuries, because he entered the AJDC with a complex medical condition that progressively worsened before, during, and after the time when ADC was responsible for his health care. Causation is generally a question of fact. Parrish v. Ball, 594 F.3d 993, 1000 (8th Cir.2010). However, where the causal link is so tenuous as to justify taking it from the trier of fact, a court may decide the issue as a matter of law. Ricketts v. City of Columbia, 36 F.3d 775, 779-80 (8th Cir.1994). After a bench trial, this court reviews the district court’s findings of fact for clear error. Lenz, 490 F.3d at 994; see also Fed.R.Civ.P. 52(a).
In a related argument, VonWald contends that expert testimony was required to prove that VonWald and the ADC should have provided Schaub different treatment to alleviate his suffering. See Alberson v. Norris, 458 F.3d 762, 765-66 (8th Cir.2006) (finding the failure to produce expert testimony that a lack of proper medical treatment caused inmate’s death was fatal to a deliberate indifference claim, where the inmate’s cause of death was pulmonary hemorrhage and renal failure resulting from Goodpasture Syndrome, a rare autoimmune disease difficult to diagnose because its symptoms present a “confusing clinical picture” and “[n]o definitive therapy exists.”); Robinson v. Hager, 292 F.3d 560 (8th Cir.2002) (finding that expert testimony was required to show causal link between prison officials’ failure to administer blood pressure medication and an inmate’s stroke).
In this case, expert testimony on causation was unnecessary because VonWald’s deliberate indifference clearly exacerbated Schaub’s wounds. See Ricketts, 36 F.3d at 779-80 (if in a particular case relevant evidence of causation makes the issue “free from doubt,” the court may find causation as a matter of law). The district court found that the seriousness of Schaub’s wounds and his deteriorating condition were readily apparent to the untrained eye (and nose). Schaub suffered from bed sores that got infected — while serious, such sores are not susceptible to misdiagnosis, incapable of treatment, or a sophisticated medical condition resulting from myriad attenuated causes.[10] The dis *922 trict court also found that the ADC could not accommodate his known needs, yet VonWald, aware of these needs, hid this fact from Judge Williamson.
The dissenting opinion asserts that any connection between the VonWald letter and the denial of Schaub’s home-monitoring request is “pure speculation,” post at 929. The VonWald letter cannot be divorced from its context — Schaub’s petition for home-monitoring was on the basis that the ADC could not adequately meet his physical and medical needs, and VonWald was responding to a direct judicial inquiry on the ability of the ADC to meet those needs. Based on this specific inquiry to VonWald and the fact that Judge Williamson appended VonWald’s letter to her order denying Schaub’s petition and incorporated it by reference, the district court correctly reasoned that Judge Williamson would have denied Schaub’s petition if VonWald had accurately represented that the ADC could not adequately care for him. The district court properly concluded VonWald’s affirmative misrepresentation of the ADC’s capabilities has a direct connection to the subsequent deterioration of Schaub’s condition.
The evidence showed that treatment of Schaub’s pressure sores, edema, and spasticity required close observation, regular dressing of his wounds, a mechanism sufficient to elevate his legs, a pressure-relieving mattress, and bedside grab bars that would allow repositioning. The district court found that VonWald failed to attend to these needs: upon his return to the ADC, Schaub was placed in a cell without a pressure-relieving mattress, grab-bars, a padded toilet seat, or a shower he could use. He went for days without being bathed, having his wound dressings changed, or seeing a doctor — all while his daily requests for assistance were ignored. The testimony of Dr. Molella and three ADC nurses, along with the abundant notes in Schaub’s file documenting his decline and the shortcomings of the ADC in treating his condition, were evidence that VonWald’s deliberate indifference to his condition caused a substantial risk of serious harm to him. The district court did not clearly err in finding VonWald’s deliberate indifference caused injury to Schaub.[11]
III.
VonWald appeals the district court’s award of $750,000 in punitive damages. His issue is stated as: “The district court abused its discretion in its award of punitive damages to Phillip David Schaub because of a lack of evidence of improper conduct and lack of evidence of the personal financial resources of VonWald.”
Punitive damages may be awarded under 42 U.S.C. § 1983 “when the defendant’s conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.” Smith v. Wade, 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983). Punitive damages punish a defendant for outrageous, intentional, or malicious conduct, and deter similar extreme conduct in the *923 future.[12] Id. at 54, 103 S.Ct. 1625; City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 266-67, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981). It is a question of fact whether a defendant’s conduct was motivated by an evil motive or involves reckless indifference to the federally protected rights of others. Coleman, 114 F.3d at 787. After a bench trial, this court reviews the district court’s findings of fact for clear error, and its legal conclusions de novo. Lenz v. Wade, 490 F.3d 991, 994 (8th Cir.2007); see also Fed.R.Civ.P. 52(a). A finding is clearly erroneous when “although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.” Anderson v. City of Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948)). A reviewing court should not reverse the finding of the trier of fact simply because it would have decided the case differently if finding the facts de novo. Anderson, 470 U.S. at 573, 105 S.Ct. 1504. If the district court’s account of the evidence is plausible in light of the entire record, this court may not reverse even though convinced this court would have weighed the evidence differently if sitting as the trier of fact. Id. at 573-74, 105 S.Ct. 1504. Where there are two permissible views of the evidence, the factfinder’s choice between them cannot be clearly erroneous. Id. at 574, 105 S.Ct. 1504. When findings are based on witness credibility, Rule 52(a) demands even greater deference to the trial court’s findings. Id. at 575,105 S.Ct. 1504.
Once the callousness threshold is met, an award of punitive damages is a “discretionary moral judgment” reviewed only for an abuse of discretion, a “highly deferential standard of review.” Royal v. Kautzky, 375 F.3d 720, 724 (8th Cir.2004) (noting that a district court has discretion to make a judgment call “without fear of inappropriate appellate intervention”); Coleman, 114 F.3d at 787; see also Cooper Industries, Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 433, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001) (“If no constitutional issue is raised,[13] the role of the appellate court, at least in the federal system, is merely to review the trial court’s determination under an abuse-of-discretion *924 standard.”) (internal quotation makes and citation omitted); Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 401, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990) (“When an appellate court reviews a district court’s factual findings, the abuse-of-discretion and clearly erroneous standards are indistinguishable: A court of appeals would be justified in concluding that a district court had abused its discretion in making a factual finding only if the finding were clearly erroneous.”). In sum, an appellate court should not lightly reverse a district court’s decision to award — or not award — punitive damages in a § 1983 case. Royal, 375 F.3d at 724.
VonWald appears to attack the legal sufficiency of the evidence supporting the district court’s factual determination that his conduct involved reckless or callous indifference to Schaub’s medical needs — the threshold inquiry for the award of punitive damages. Although VonWald did not object at trial or post-trial to the punitive damages award, this court may still review the sufficiency of the evidence because this case was tried to a judge instead of a jury. See Fed.R.Civ.P. 52(a)(5) (In an action tried on the facts without a jury, “[a] party may later question the sufficiency of the evidence supporting the findings, whether or not the party requested findings, objected to them, moved to amend them, or moved for partial findings”); Phoenix Assur. Co. of N.Y. v. Appleton City, Mo., 296 F.2d 787, 795-96 (8th Cir.1961) (“Since this case was tried to the court and a Master, by reason of Rule 52(b) [now Rule 52(a)(5) ] the plaintiff was not required to raise the question of the sufficiency of the evidence to support the findings in the trial court to lay the foundation for its appeal.”).
The district court found that VonWald’s conduct involved reckless or callous indifference to Schaub’s serious medical needs because he ignored the medical concerns raised by Schaub’s doctors and Judge Williamson. While prison supervisors cannot held liable under § 1983 on a theory of respondeat superior, they can incur liability when their corrective inaction amounts to deliberate indifference to or tacit authorization of an Eighth Amendment violation. Langford v. Norris, 614 F.3d 445, 460 (8th Cir.2010). ‘Where a prisoner needs medical treatment prison officials are under a constitutional duty to see that it is furnished.” Crooks v. Nix, 872 F.2d 800, 804 (8th Cir.1989).
A finding of deliberate indifference to a serious medical need, while establishing liability under § 1983, does not necessitate a finding of callous indifference warranting punitive damages. Coleman, 114 F.3d at 787. Here, the record shows that the ADC could not accommodate Schaub’s known needs, and that VonWald knew this fact. VonWald himself testified that he had no intention of providing him a pressure-relieving mattress, as the ADC did not allow outside mattresses. Despite this knowledge, VonWald made false statements in response to a direct judicial inquiry concerning the ability of VonWald and the ADC to protect Schaub from further injury. Judge Williamson was considering the option of electronic home-monitoring, and asked VonWald his view whether the ADC could adequately accommodate Schaub’s needs. VonWald stated that the concerns of Dr. Stolp and Schaub could be addressed at the ADC. After Schaub’s re-entry to the ADC, VonWald failed to take adequate steps to provide him necessary care or remove him from the ADC. This was a sufficient evidentiary basis for the district court to find that VonWald’s behavior called for an award of punitive damages. See Smith, 461 U.S. at 56, 103 S.Ct. 1625 (holding that punitive damages in a § 1983 action are permissible *925 upon a showing of reckless or callous indifference to a prisoner’s Eighth Amendment rights, notwithstanding that the underlying standard of liability for an Eighth Amendment violation was also one of recklessness).
The dissenting opinion faults the district court for not making findings on the need for additional deterrence or punishment. On the contrary, the district court stated that punitive damages are appropriate where “the defendant’s conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.” Smith, 461 U.S. at 56, 103 S.Ct. 1625. The court then expressly found that 1) Schaub had a clear and obvious serious medical need known to VonWald, 2) VonWald gave a false and misleading reply to a direct judicial inquiry concerning the ability to care for him, and 3) VonWald showed reckless and callous indifference in failing to provide Schaub necessary care, resulting in a direct consequence of four years of pain, loss of income, and loss of future mobility. The court then made an explicit finding that VonWald’s conduct merited a punitive award of $750,000 in addition to the compensatory award: “I find it appropriate to award punitive damages in the amount of $750,000 as a consequence of these determinations.” The district court adequately explained the appropriateness of punitive damages, and did not need to make additional findings on the need for punishment or deterrence. See id. at 54, 103 S.Ct. 1625 (noting that “society has an interest in deterring and punishing all intentional or reckless invasions of the rights of others”) (emphasis in original).
As part of his argument, VonWald asserts that the district court should have made findings of fact on his ability to satisfy a punitive damages award before awarding punitive damages. At most, this court reviews this assertion for plain error, as VonWald never objected at trial to the award of punitive damages or requested findings of fact on his ability to pay. See Wiser v. Wayne Farms, 411 F.3d 923, 927 (8th Cir.2005) (“an unpreserved error in the civil context must meet at least the Olano standard to warrant correction.”). “ ‘Plain error is a stringently limited standard of review,’ especially in the civil context, and must result in a miscarriage of justice in order to compel reversal.” Horstmyer v. Black & Decker, (U.S.), Inc., 151 F.3d 765, 771 (8th Cir.1998) (quoting Rush v. Smith, 56 F.3d 918, 925 (8th Cir.1995) (en banc)).
While Civil Rule 52 permits appellate review of the sufficiency of the evidence in a bench trial, legal errors by the district court must still be objected to in order to be preserved for review. See Miller v. Bittner, 985 F.2d 935, 940 (8th Cir.1993) (noting that although the federal courts give Rule 52 full effect when applicable, “the general principle of Rule 46 [that issues not raised and preserved below will not be considered on appeal] is still controlling and that, except as specifically otherwise provided in Rule 52, it is necessary that a party make known to the trial court his objection to the action taken by it and the grounds of the objection.”) (quoting 9C Wright & Miller, Federal Practice and Procedure § 2581); see also Porterco, Inc. v. Igloo Products Corp., 955 F.2d 1164, 1173 (8th Cir.1992) (“To obtain appellate review of a trial court’s acts or omissions a party must have made known to the [trial] court the action which the party desires the court to take or the party’s objection to the action of the court and the grounds therefor.”) (internal quotation marks and citation omitted); McNeely v. United States, 353 F.2d 913, 917 (8th Cir.1965) (“It is an axiom of trial procedure that counsel must take the ini *926 tiative in protecting the rights of his clients____ A party may not stand idly by, watching the proceedings and allowing the Court to commit error of which he subsequently complains.”). Waiver and forfeiture rules “ ‘inform promptly the trial judge of possible errors so that he may have an opportunity to reconsider his ruling and make any changes deemed desirable.’ ” United States v. Castellanos, 608 F.3d 1010, 1018 (8th Cir.2010) (quoting Morrow v. Greyhound Lines, Inc., 541 F.2d 713, 724 (8th Cir.1976)).
Initially (and fatally), the burden was on VonWald to introduce evidence of his net worth. See Grabinski v. Blue Springs Ford Sales, Inc., 136 F.3d 565, 570-71 (8th Cir.1998) (holding that it is a defendant’s burden to introduce evidence of net worth for purposes of minimizing a punitive damages award); see also Latham Seed Co. v. Nickerson Am. Plant Breeders, Inc., 978 F.2d 1493, 1500 (8th Cir.1992) (affirming an award of punitive damages where the defendant had an opportunity to provide the jury with information on net worth, but failed to do so). The complaint sought punitive damages, and Schaub’s counsel argued for them (seeking a $6 million verdict) before the district court made findings of fact and awarded the punitive damages. VonWald introduced absolutely no such evidence, nor in any way indicated that his financial resources were relevant. The district court did not err, much less plainly err, by not making findings of VonWald’s financial means before awarding punitive damages.[14]
To the extent VonWald styles his argument as an attack on the sufficiency of the evidence to support punitive damages because of the lack of net-worth evidence, such evidence is not necessarily required. VonWald cites no authority that evidence of a defendant’s net worth is a prerequisite to an award of punitive damages. VonWald invokes the Hollins and Bankers Life cases, which state only that a defendant’s wealth is one factor that may be considered in assessing an award of punitive damages. See Hollins v. Powell, 773 F.2d 191, 197-98 (8th Cir.1985) (noting that “in assessing punitive damages, it is appropriate to consider the defendant’s net worth,” and that “[w]e can see neither the justice nor sense in affirming a verdict which cannot possibly be satisfied”); Bankers Life & Cas. Co. v. Kirtley, 307 F.2d 418, 425 (8th Cir.1962) (noting that “the wealth of the defendant is a factor to consider in an award of exemplary damages”); see also City of Newport, 453 U.S. at 270, 101 S.Ct. 2748 (noting that “evidence of a tortfeasor’s wealth is traditionally admissible as a measure of the amount *927 of punitive damages that should be awarded.”).
To the contrary of VonWald’s argument, “[t]he focus, in determining the propriety of punitive damages, is on the intent of the defendant and whether the defendant’s conduct is of the sort that calls for deterrence and punishment over and above that provided by compensatory awards.” Coleman, 114 F.3d at 787 (internal citations omitted). Based on the district court’s findings of fact, which are not clearly erroneous, the district court did not abuse its substantial discretion in awarding punitive damages in this case.
The judgment of the district court is affirmed.

. The Honorable James M. Rosenbaum, United States District Judge for the District of Minnesota, now retired.

. While the dissenting opinion emphasizes that Schaub's initial pressure sore on his heel was “caused by wearing a shoe” in Minnesota in mid-March, post at 930, Schaub had edema and wore shoes well before he ever entered the ADC. The "cause” of the pressure sore was the fact that the ADC failed to provide Schaub with bedding sufficient to elevate his legs high enough to drain and relieve the pressure.

. True, as the dissenting opinion notes, Schaub did not use the formal grievance process to protest the lack of medical care. However, he testified he had no knowledge of a formalized grievance system.

. The dissenting opinion stresses that when reading this letter, VonWald was under the impression that Schaub would remain in work release upon his return to the ADC after recuperating from his broken leg. However, this ignores the fact that Schaub was suffering from bed sores, and all detainees (full-time or work-release) sleep at the ADC, a facility without a pressure mattress or grab bars to allow repositioning. As Schaub stated in his affidavit in support of his petition for electronic home-monitoring, “I am usually only sleeping there, and it is the sleeping time that is causing the damage to my body.”

. The dissenting opinion claims this court over-emphasizes that VonWald never intended to provide a pressure-relieving mattress, as Schaub had a regular mattress at home and the ADC provided him with additional bedding materials. Schaub did testify he had a regular mattress at home on his hospital bed in the years before he had problems with pressure sores, because at the time he had intact skin, a padded toilet seat, a padded shower bench, and a bed with enough rails and room to reposition himself regularly. He also testified that the additional bedding the ADC provided him was insufficient to alleviate his pressure sores or allow his legs to *917 drain. Dr. Molella confirmed that "we couldn’t bring in the kinds of mattresses that would be helpful for Mr. Schaub, primarily because there was a fire marshal or a safety concern with those mattresses.” In any event, the (non)provision of a pressure mattress was not the sine qua non of the Eighth Amendment violation found by the district court. Aside from the pressure mattress, Schaub still required grab bars or some other mechanism to reposition his body regularly (the dissent points out that Dr. Molella wrote that he should be repositioned hourly, but there is no indication this was ever done). He still required his wounds to be regularly cleaned, his dressings changed, regular, bathing, and a handicapped-accessible toilet with a padded toilet seat.

. Contrary to the dissent’s formulation, this court does not hold that VonWald had a duty to assume the hands-on management of Schaub’s care. Prison officials are not doctors. This court holds that when personally confronted with the serious medical needs of a prisoner, prison officials cannot be deliberately indifferent to those needs by inaction, a well-established proposition.

. The dissent stresses that Schaub had pressure sores when he re-entered the ADC. While Schaub had previously had superficial pressure sores that healed quickly through prompt medical attention, he had never had *919 his medical needs ignored until after the sores were so infected that skin and surrounding bone were eventually eaten away. The district court found Schaub credible. Schaub testified, while explaining a picture of the blackened, rotten pressure sores on his heels, “my heels weren’t in this bad a shape until after I was in jail the second time and not, not helped with the bandage changing.”

. The dissenting opinion emphasizes that Dr. Molella testified that a DuoDERM dressing (a "second skin” that provides a moist, wound-healing environment) does not invariably have to be changed daily, and "can stay on until, essentially, the wound is healed.” However, Dr. Molella qualified this statement, saying the frequency of dressing "depends on if it’s continuing to adhere, it depends on whether it continues to be functional, if it’s covering the area that needs to be covered.” Nurse Anne Polikowsky testified that DuoDERM dressings are changed every three days, or as needed. After some of Schaub’s wounds were dressed with DuoDERM on July 17, they were not changed until July 23. Most importantly, it was Schaub's testimony that rather than actually being dressed with DuoDERM, the pressure sores on his heel wounds were dressed with a traditional wet-to-moist or wet-to-dry gauze dressing that must be changed at least twice daily to prevent the dressing from drying out. Dr. Molella, asked about Schaub’s testimony, did not disagree, indicating that she asked the nursing staff "that he be given the assistance he requested” with dressing his wounds. Schaub testified that when his wounds were finally dressed on July 23, the dressings had become so dry that flesh came off with the dressing. Regardless of the dressing, it was not "functional” on July 22 when the ADC medical staff noted a "strong odor” from Schaub's wounds, yet his wounds were not dressed (nor was he bathed) until more than 24 hours later.

. As the district court noted, "What I have is the plaintiff who claims that he needed daily care, no showing that he received it, and in this case I credit the plaintiff's testimony.”

. Contrary to the implication of the dissenting opinion, VonWald was not assessed damages for Schaub's femur fracture or the surgery to repair it. Damages were assessed for the complications from bed sores that became infected in the ADC, which included years of being bedridden in what Schaub described as "horrific pain” with accompanying loss of income and mobility. Toward the end of this period, Schaub had surgery to close the wounds, which resulted in Schaub losing the upper part of his femur and part of his pelvis. According to Schaub, "the infection had gotten so bad that it literally had eaten the whole femur head up.” Schaub’s bed sores on his right ischial (buttocks) and sacral (lower back) regions initially began as superficial pressure sores from small bruises sustained in the fall (the fracture happened when he transferred to his wheelchair and landed on the edge of the seat, causing the chair to slide backwards and Schaub to fall hard on his right knee and topple to the floor).
However, at the time of his pressure sore surgeries, the femur fracture (on the knee end) was years in the past and not a proximate source of his ongoing problems. Schaub had experienced superficial pressure sores without incident in the past, and there is no evidence Schaub's pressure sores were infected before his deficient treatment in the ADC. Thus, the district court’s award of compensatory damages for pain and suffering and loss of income for the years Schaub spent bedridden had little to do with his earlier fracture or surgery.

. The dissenting opinion claims there is little evidence about the extent to which VonWald's conduct aggravated Schaub's pressure sores, and claims the compensatory damages compensated him for his decline after he left the ADC, rather than for any injury caused by VonWald. Schaub, a paraplegic for nearly 20 years, had occasionally experienced superficial bed sores that quickly healed through adequate medical care. Due to complications from infected bed sores that were not adequately treated in the ADC, Schaub endured multiple surgeries, four years of significant pain, loss of income, and a permanent loss of future mobility. There is no evidence that Schaub's pressure sores were infected when he entered the ADC.

. The dissenting opinion contends that VonWald could not be further deterred by punitive damages because by the time of trial he was no longer the ADC director. This contention ignores the deterrence rationale of punitive damages — to deter others in addition to punishing the defendant. See Coleman, 114 F.3d at 787 (noting that punitive damages are awarded to " 'punish the defendant for his [or her] willful or malicious conduct and. to deter others from similar behavior.' ”) (quoting Memphis Community Sch. Dist. v. Stachura, 477 U.S. 299, 306 n. 9, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986) (emphasis added)). Other prison administrators should be deterred from making a false response to a direct judicial inquiry and completely failing to provide adequate care for an inmate's serious medical needs.

13. VonWald did not raise the constitutionality of the punitive damages award in the district court or before this court. In fact, VonWald's reply brief states that the analysis in BMW of North America v. Gore "has no applicability to this matter,” and contrasts his own argument (that the district court's factual determination of reckless indifference is clearly erroneous) with an evaluation of the constitutionality of the punitive damages award. See Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 276-77 & n. 23, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989) ("Because petitioners failed to raise their due process argument before either the District Court or the Court of Appeals, and made no specific mention of it in their petition for certiorari in this Court, we shall not consider its effect on this [punitive damages] award.... We shall not assume that a nonconstitutional argument also includes a constitutional one.”).

. According to the dissenting opinion, Bred-berg v. Long demands that this court set aside the punitive damages award because of a lack of evidence regarding the financial status of VonWald, and Grabinski "is at odds with Hollins and Bredberg," post at 941. Bredberg applied the law of Minnesota, that a punitive damages award for fraud must be supported by evidence as to the financial condition of the defendant. See Bredberg v. Long, 778 F.2d 1285, 1290 (8th Cir.1985); Minn.Stat. § 549.20, subd. 3 ("Any award of punitive damages shall be measured by those factors which justly bear upon the purpose of punitive damages, including ... the financial condition of the defendant ...”); but see Melina v. Chaplin, 327 N.W.2d 19, 20 & n. 1 (Minn. 1982) (rejecting a challenge to the size of a punitive damages award because "neither the trial court nor this court has been furnished with any evidence submitted by either party respecting [the defendant's] ability to pay the punitive damage award.”). Neither Bredberg nor Hollins are inconsistent with Grabinski’s holding that as a matter of federal law, it is a defendant's burden to introduce evidence of net worth for purposes of minimizing a punitive damages award. See also Mason v. Okla. Turnpike Auth., 182 F.3d 1212, 1214 (10th Cir.1999); Kemezy v. Peters, 79 F.3d 33, 36 (7th Cir.1996); Fishman v. Clancy, 763 F.2d 485, 490 (1st Cir.1985).