# United States Court of Appeals
## For the Eighth Circuit

_____

No. 21-3755

_____

Jamie Leonard

*Plaintiff - Appellant*

v.

St. Charles County Police Department; St. Charles County Department of Corrections

*Defendants*

Steven Harris; Donte Fisher; Lisa Baker

*Defendants - Appellees*

Thomas Lupo; Katie Krankel Garofalo

*Defendants*

Theresa Martin

*Defendant - Appellee*

Nurse Theresa; Dr. John or Jane Doe

*Defendants*

St. Charles County

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: September 20, 2022
Filed: February 3, 2023

_____

Before COLLOTON, WOLLMAN, and STRAS, Circuit Judges

_____

STRAS, Circuit Judge.

While in jail, Jamie Leonard clawed at his own eye with enough force to tear it out. The question is whether qualified immunity is available to those who may have prevented the injury. We conclude it is.

I.

Leonard entered police custody after he broke into a house. The arresting officers noticed that he was behaving erratically, so they took him to a local hospital to determine whether he was "fit for confinement." Doctors concluded he was, so the officers placed him in the St. Charles County Justice Center, a maximum-security facility.

Leonard's mother called to inform the jail's medical staff that Leonard had prescription medications for two conditions: a mental illness and Reiter's Syndrome, which can cause eye inflammation. At the jail's direction, she dropped off his prescriptions the next day, but Nurse Theresa Martin never administered them.

Leonard's mental health declined during his confinement. At one point, he removed his clothes, stuffed his hand down his throat, and jammed his fingers up his nose. When Nurse Martin asked him why he was acting that way, he said that he

"ha[d] to get [his] soul out because it [was] time for [him] to die." Concerned for his safety, she placed him in the Suicide Prevention Unit, where he would receive "close observation."

To make sure inmates do not have access to anything dangerous, officers must perform an end-of-shift search of every cell in the Suicide Prevention Unit. When it was Leonard's turn for a search, Officers Steven Harris, Donte Fisher, and Kristian Scott entered together. The reason was his imposing size: he stood six-foot eight-inches tall and weighed 300 pounds. And given his erratic behavior, the officers did not want to take any chances.

The search did not go smoothly. At first, Leonard followed instructions, including one to kneel while handcuffed at the back wall. But it did not last. He soon stood up and moved toward the open cell door. Officers Fisher and Scott had trouble stopping him, so Officer Harris unleashed a short burst of pepper spray into Leonard's eyes, which caused him to recoil in pain and fall on his cot. Cameras caught the entire incident on video.

Nurse Martin arrived soon thereafter to provide medical attention. Although she recommended a transfer to the medical-treatment area and a shower, the officers overruled her. In their view, it was too dangerous to have him remain outside his cell. So they placed him in a new cell with a sink, where he could wash out his eyes.

Almost an hour later, the situation turned from bad to worse. Leonard started frantically clawing at his eyes. After a few minutes, it became clear that he was doing serious damage, so Officer Scott called for help. Sergeant Lisa Baker was the first to respond, but both waited to assist him until "appropriate backup" arrived.

By the time it did, Leonard's left eyeball was dangling from its socket. Nurse Martin tried to save the eye by replacing it and covering it with gauze, but it was too late. Leonard permanently lost his vision from that side.

Leonard sued nearly everyone involved, including St. Charles County, under 42 U.S.C. § 1983. *See Monell v. Dep't of Soc. Servs. of N.Y.C.*, 436 U.S. 658, 691 (1978). The case ended at summary judgment, however, when the district court[1] concluded that none of the individuals involved had violated his Fourth, Eighth, or Fourteenth Amendment rights. Nor, in the absence of a constitutional violation or a county-wide custom of unconstitutional conduct, was St. Charles County liable for his injuries.

## II.

We review the grant of summary judgment de novo. *See Morgan v. Robinson*, 920 F.3d 521, 523 (8th Cir. 2019) (en banc). Summary judgment is appropriate when there are no "genuine issue[s] of material fact," and the moving party is entitled to judgment as a matter of law. *McManemy v. Tierney*, 970 F.3d 1034, 1037 (8th Cir. 2020).

In deciding whether the district court should have granted summary judgment, we ask two questions. First, did the defendants violate a constitutional right? Second, was the right clearly established? *See Morgan*, 920 F.3d at 523. If the answer to either question is "no," Leonard's claims end here. *See id.* (explaining that we may answer these questions in either order).

## A.

The answer to the first question resolves the excessive-force claim against Officer Harris, who pepper sprayed Leonard while searching his cell. To succeed, Leonard had to show that the decision to use non-lethal force against him was objectively unreasonable. *See Graham v. Connor*, 490 U.S. 386, 395 (1989); *see*

---

[1]The Honorable Matthew T. Schelp, United States District Judge for the Eastern District of Missouri.

*also Davis v. White*, 794 F.3d 1008, 1011–12 (8th Cir. 2015) (explaining that the "objective-reasonableness standard" applies to pretrial detainees).

The circumstances here would have suggested to "a reasonable officer on the scene," *Graham*, 490 U.S. at 396, that Leonard posed a threat, *see Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). He had just refused to obey a direct order to remain kneeling, physically resisted the two officers trying to restrain him, and started to move toward the open door in his cell. Only then did Officer Harris use pepper spray to stop him. *See id.* (considering the extent of the force used in evaluating whether an officer acted reasonably).

Given the fast-moving and volatile situation he faced, the use of non-lethal force was reasonable under the circumstances. Another officer had warned Leonard about the possible use of pepper spray, but it made no difference. *See Johnson v. Blaukat*, 453 F.3d 1108, 1113 (8th Cir. 2006) (noting the importance of whether officers give a warning before using force). In that "split-second," Officer Harris faced a difficult choice: do nothing and risk Leonard's escape or use non-lethal force to subdue him. *Graham*, 490 U.S. at 397. Given Leonard's "size[] and strength," which made wrestling him to the ground impractical and dangerous, he chose the latter option. *Johnson v. McCarver*, 942 F.3d 405, 411 (8th Cir. 2019).

In those ways, this case is distinguishable from *Tatum v. Robinson*, 858 F.3d 544 (8th Cir. 2017), which involved a "*non*-resisting, *non*-fleeing" shoplifting suspect who was pepper sprayed inside a department store. *Id.* at 549 (emphasis added). In this case, by contrast, Leonard had failed to follow directions, slipped away from two officers, and was on his way to escaping. The fact that the use of pepper spray was unreasonable in *Tatum*, *id.* at 551, tells us nothing about whether its use here crossed a constitutional line. The two situations are "just too different." *Laney v. City of St. Louis*, 56 F.4th 1153, 1158 (8th Cir. 2023) (citation omitted).

B.

Qualified immunity also stands in the way of the claims against Officer Fisher, Sergeant Baker, and Nurse Martin. Each allegedly arises out of their "deliberate indifference" to his "serious medical needs." *Olson v. Bloomberg*, 339 F.3d 730, 735 (8th Cir. 2003) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)); *see* U.S. Const. Amend VIII, XIV; *Hartsfield v. Colburn*, 371 F.3d 454, 456–57 (8th Cir. 2004) (explaining that the Eighth Amendment's deliberate-indifference standard applies to pretrial detainees through the Fourteenth Amendment).

"[D]eliberate indifference is a difficult standard to meet." *Spencer v. Knapheide Truck Equip., Co.*, 183 F.3d 902, 906 (8th Cir. 1999). It requires an official to consciously disregard a known and "objectively serious medical need." *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011). A serious medical need is one diagnosed by a physician or "so obvious that even a layman would recognize [it]." *Id.* (citation omitted). And the disregard for it must rise to the level of criminal recklessness. *Jackson v. Buckman*, 756 F.3d 1060, 1066 (8th Cir. 2014); *see Estelle*, 429 U.S. at 105–06. Only then is the failure to act a "punishment[]." *Estelle*, 429 U.S. at 102–06; *see* U.S. Const. amend. VIII.

We will assume that each of the three officials knew that Leonard had at least one "objectively serious medical need." *Schaub*, 638 F.3d at 914. Officer Fisher was there when Leonard was pepper sprayed at close range. *Compare Lawrence v. Bowersox*, 297 F.3d 727, 731–32 (8th Cir. 2002) (holding that a pepper-spray shower created an objectively serious medical need), *with Jones v. Shields*, 207 F.3d 491, 493–95 (8th Cir. 2000) (treating a short burst of pepper spray as a "de minimis injury"). Sergeant Baker stood outside the cell door as Leonard frantically clawed at his eyes. *See Camberos v. Branstad*, 73 F.3d 174, 176 (8th Cir. 1995) (noting that a medical need is "serious" when a layman would recognize it). And Nurse Martin heard Leonard talk about killing himself. *See Gregoire v. Class*, 236 F.3d 413, 417

-6-

(8th Cir. 2000) (concluding that the "risk of suicide by an inmate is [itself] a serious medical need").

The claims, however, run into other problems. The record is devoid of evidence that Officer Fisher and Sergeant Baker consciously disregarded a serious medical need. And even if Nurse Martin's failure to administer Leonard's medications approached criminal recklessness, we cannot say that the law was so "clearly established" that she was on "fair notice" she was violating it. *McManemy*, 970 F.3d at 1040.

1.

Even under a "plaintiff-friendly" version of the facts, Officer Fisher did not recklessly disregard a serious medical need. *Laney*, 56 F.4th at 1158. Assuming the use of pepper spray created one, he still must prove that Fisher acted recklessly in dealing with it. *See Holden v. Hirner*, 663 F.3d 336, 343 (8th Cir. 2011).

Officer Fisher faced competing demands. On the one hand, he was dealing with a potentially dangerous, noncompliant inmate who was acting erratically. On the other, he needed to find a way for Leonard to wash out his eyes. He settled on a middle ground: he moved Leonard to a new cell with a sink rather than allowing him to shower in an open area. Even if this "judgment call" was unreasonable—and we doubt it was—he was not deliberately indifferent to Leonard's condition. *Krout v. Goemmer*, 583 F.3d 557, 570 (8th Cir. 2009).

Leonard's position is that a jury could nevertheless reasonably conclude that Officer Fisher's refusal to do more was a constitutional violation. We disagree. It is well-established that "an inmate is not entitled to any particular course of treatment." *Dulany v. Carnahan*, 132 F.3d 1234, 1240 (8th Cir. 1997); *see Hancock v. Arnott*, 39 F.4th 482, 488 (8th Cir. 2022). And here, there was a difficult balancing involved: the "institutional security" of the jail versus Leonard's need for relief from

the pain. *Kingsley*, 576 U.S. at 397 (quotation marks omitted). Choosing a middle ground comes nowhere close to criminal recklessness.

For that reason, this is not one of those cases in which there was a complete and unjustifiable lack of treatment. *See, e.g.*, *Iko v. Shreve*, 535 F.3d 225, 242 (4th Cir. 2008). Indeed, Leonard cannot point to any court that has held that an officer was deliberately indifferent because he placed a pepper-sprayed inmate in a new cell with a sink. We will not be the first.

2.

The claim against Sergeant Baker meets a similar fate. After Leonard settled into his new cell, she was among the first to see him clawing at his eyes. Rather than immediately trying to deal with the situation, however, she waited for "appropriate backup." Under the circumstances, her decision was not deliberately indifferent.

Inmates can self-induce objectively "serious medical needs." *Schaub*, 638 F.3d at 914. And, in those situations, a failure to act can give rise to Section 1983 liability. *See Olson*, 339 F.3d at 735–36 (holding a jailer liable for a preventable suicide). Still, the deliberate-indifference standard "incorporates due regard for the unenviable task of keeping dangerous men in safe custody." *Farmer v. Brennan*, 511 U.S. 825, 844–45 (1994) (quotation marks omitted).

Leonard qualified as a "dangerous m[an]." *Id.* He stood at six-feet eight-inches tall and weighed 300 pounds. He was in a frenzied state, unhandcuffed, and had just proven that he would not follow simple directions. Calming him down would not have been easy. Just like Officer Fisher, Sergeant Baker balanced the potential risk of immediate action against the urgency presented by Leonard's

condition and decided that waiting a few minutes for "appropriate backup" would be the safest option.

Jail officials have latitude to make "judgment call[s]" in chaotic situations like this one. *Krout*, 583 F.3d at 570 (concluding there was no criminal recklessness when an officer waited four minutes for medical professionals to arrive rather than performing CPR himself); *cf. Graham*, 490 U.S. at 396–97 (noting in the Fourth Amendment context that courts must account for the fact that decisions are often made "in circumstances that are tense, uncertain, and rapidly evolving"). "[D]eliberate indifference," after all, "must be viewed from [Sergeant Baker's] perspective at the time . . . , not with hindsight's perfect vision." *Jackson v. Everett*, 140 F.3d 1149, 1152 (8th Cir. 1998). So even if her decision to wait turned out to be the wrong one, we cannot say it rose to the level of criminal recklessness. *See Krout*, 583 F.3d at 567–68 (explaining that negligence is not enough).

Nor is there, as Leonard argues, a blanket rule requiring jail officials to immediately intervene and stop all "ongoing acts of self-harm." Some situations present too much risk. *See Farmer*, 511 U.S. at 844–45. It is true that the failure to intervene can sometimes result in liability. But when it does, the inmate usually poses no threat to the safety of others. The classic example is a suicidal but otherwise nonviolent inmate. *See, e.g.*, *Olson*, 339 F.3d at 735 (denying qualified immunity to a jail guard who told a suicidal inmate, "you do what you got to do," and left the area (brackets omitted)); *see also Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1082 (9th Cir. 2013). The point is that, when immediate intervention poses a safety risk, the calculus changes.

3.

When it comes to Leonard's deliberate-indifference claim against Nurse Martin, we have to turn back the clock. According to him, her early failure to administer his prescription medications started the entire chain of events that

-9-

eventually led to the loss of the eye. Although it is a close call whether her lack of action shows a deliberate indifference to a serious medical need, we ultimately conclude that the constitutional violation, if any, was not clearly established at the time. *See McManemy*, 970 F.3d at 1038, 1039; *Morgan*, 920 F.3d at 523 (allowing courts to address the "clearly established" requirement first).

There is no dispute that Leonard did not receive a single dose of prescription medication, including for his mental illness, until after he had damaged his eye. And Nurse Martin did not have the jail pharmacy dispense an available alternative. Instead, she dealt with his psychosis by placing him in the Suicide Prevention Unit, where he was "close[ly] observ[ed]."

The question here is whether these decisions rise to the level of "punishment[]." *Estelle*, 429 U.S. at 102–106. At first glance, it might seem that they do. We have said that, "[w]hen an official denies a person . . . medication that has been prescribed, constitutional liability *may* follow." *Dadd v. Anoka County*, 827 F.3d 749, 757 (8th Cir. 2016) (emphasis added); *see Phillips v. Jasper Cnty. Jail*, 437 F.3d 791, 796 (8th Cir. 2006) ("[T]he knowing failure to administer prescribed medicine *can* itself constitute deliberate indifference." (emphasis added)).

But liability is not automatic. The word "may" leaves room for consideration of the specific facts and circumstances of the case, including any precautionary measures Nurse Martin *did* take. Here, once Leonard began showing suicidal tendencies, she placed him in the Suicide Prevention Unit, which had procedures in place to prevent inmates from harming themselves. It did not stop him from inflicting irreversible damage on his eye, as it turns out, but we only know that with the benefit of hindsight. *See Jackson*, 140 F.3d at 1152.

Compare what Nurse Martin did with what happened in *Dadd v. Anoka County*, our leading case in the area. 827 F.3d at 755. There, the nurse refused to

-10-

provide an inmate with a prescription painkiller following dental surgery. Later, despite knowing that he could not sleep due to the pain, she still did nothing. And even after a doctor prescribed an over-the-counter pain medication, she refused to administer it. The clearly established principle from *Dadd* is that a *complete* failure to treat an extremely painful (or other serious) condition displays a reckless indifference to a serious medical need. *Id.* at 757; *see Phillips*, 437 F.3d at 796 (holding that improperly medicating an inmate and placing him in a dangerous situation can be deliberately indifferent).

Considered at the proper "level of generality," *Dadd* does not clearly establish that Nurse Martin's "*particular* conduct" was criminally reckless. *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quotation marks omitted) (cautioning courts against defining clearly established rights at a high level of generality). She placed him in a setting specifically designed to prevent self-harm. Even though her efforts were ultimately unsuccessful, it does not follow that *Dadd* would have placed her on "fair notice" that her failure to take *further* action violated clearly established law. *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004); *see Z.J. ex rel Jones v. Kan. City Bd. of Comm'rs*, 931 F.3d 672, 683 (8th Cir. 2019) (explaining that "[t]he 'clearly established' requirement of qualified immunity provides officers with ample room for honest mistakes"); *Coleman v. Parkman*, 349 F.3d 534, 539–40 (8th Cir. 2003) (noting that *failing* to place a suicidal inmate in a safe space can show deliberate indifference).

III.

Leonard's final claim seeks to hold St. Charles County liable for the actions of its employees. For most of them, the lack of a constitutional violation means "there can be no § 1983 or *Monell . . .* liability." *Sanders v. City of Minneapolis*, 474 F.3d 523, 527 (8th Cir. 2007).

There is one possible exception. Assuming Nurse Martin violated Leonard's constitutional rights, St. Charles County could be liable if a county-wide "policy or

custom" was to blame. *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999). There is no argument here that an "official policy" requires jail officials to withhold prescription medications from inmates. *Id.* The only other possibility is a custom: "a widespread and persistent pattern of unconstitutional misconduct . . . policymakers were either deliberately indifferent to or tacitly authorized." *Russell v. Hennepin County*, 420 F.3d 841, 849 (8th Cir. 2005).

The evidence of a custom is weak. The best Leonard can do is point to a handful of unconnected incidents, ranging from failing to give ulcer medication to one inmate to refusing to accommodate the food allergies of another. On these facts, no reasonable factfinder could conclude that Leonard carried his "heavy burden" to show a "widespread, persistent pattern" of withholding prescription medication. *Mick v. Raines*, 883 F.3d 1075, 1080 (8th Cir. 2018) (citation omitted); *Jane Doe "A" ex rel Jane Doe "B" v. Special Sch. Dist. of St. Louis*, 901 F.2d 642, 644, 646 (8th Cir. 1990) (concluding that a handful of somewhat-related complaints against a bus driver over two years was insufficient to show a custom of "unconstitutional practices").

IV.

One loose end remains. The jail failed to prevent the deletion of a video that depicted Sergeant Baker waiting outside Leonard's cell before anyone entered. He thinks that the district court should have drawn an adverse inference and assumed that the contents of the recording were unfavorable to the defendants. *See* Fed. R. Civ. P. 37(e)(2)(A).

The district court decided against it. *See Stevenson v. Union Pacific R.R. Co.*, 354 F.3d 739, 745 (8th Cir. 2004) (reviewing for an abuse of discretion). In its view, it required "too great [of] a leap" to believe that anyone deleted the video on purpose. After all, the system automatically overwrote older recordings to make room for new ones. In the absence of evidence that the defendants had an "intent to deprive"

-12-

Leonard of "the information's use," there was no basis to impose such a drastic remedy. Fed. R. Civ. P. 37(e)(2).

V.

We accordingly affirm the judgment of the district court.

_____