# United States Court of Appeals
## For the Eighth Circuit

_____

No. 23-3382

_____

Travis Valentino Dantzler

*Plaintiff - Appellee*

v.

Tonia Baldwin, MD

*Defendant - Appellant*

Melissa Farnsworth, NSD; Stephen Weis, Superintendent/Warden; Randy Gibbs, Deputy Director; Blythe Larson

*Defendant*s

_____

Appeal from United States District Court
for the Southern District of Iowa - Central

_____

Submitted: September 24, 2024
Filed: April 8, 2025

_____

Before SMITH, ERICKSON, and STRAS, Circuit Judges.

_____

SMITH, Circuit Judge.

Inmate Travis Dantzler brought suit under 42 U.S.C. § 1983 alleging, *inter alia*, that Dr. Tonia Baldwin, a physician at the Clarinda Correctional Facility (CCF), was deliberately indifferent to his complaints of knee pain by delaying an MRI and orthopedic referral based on his parole eligibility—a nonmedical reason. Dr. Baldwin moved for summary judgment based on qualified immunity. She argued that she was not deliberately indifferent to Dantzler's serious medical needs. Alternatively, she asserted that the law was not clearly established "because no reasonable medical professional would have believed that her treatment of [Dantzler] would amount to a constitutional violation." R. Doc. 21-1, at 21. The district court[1] denied Dr. Baldwin's motion, concluding that Dantzler created a genuine issue of material fact as to whether Dr. Baldwin was deliberately indifferent. We affirm.

## I. *Background*

"In this interlocutory posture, we take as true the facts that the district court found were adequately supported, as well as the facts that the district court likely assumed, to the extent that they are not blatantly contradicted by the record. Viewed in this manner, the facts are these." *Humes v. Jones*, 109 F.4th 1112, 1115 (8th Cir. 2024) (citation omitted).

On February 17, 2020, Dantzler, an inmate at the Anamosa State Penitentiary (ASP), first reported right knee pain. He injured his knee several days prior. A nurse prescribed ibuprofen and issued a knee sleeve to Dantzler. On February 29, 2020, a second nurse saw Dantzler for his knee pain and continued ibuprofen for an additional week. On March 13, 2020, a third nurse saw Dantzler for his knee pain. That nurse restricted Dantzler to a lower bunk, advised Dantzler to refrain from all sports, allowed Dantzler to have a brace/walker, and scheduled Dantzler to see a physician.

---

[1]The Honorable Rebecca Goodgame Ebinger, United States District Judge for the Southern District of Iowa.

On March 26, 2020, Dr. Michael Dehner examined Dantzler at ASP. Dantzler reported that he had strained his right knee playing basketball and that his knee had shown little improvement since the injury. Dantzler requested guidance for rehabilitation. Dr. Dehner noted that Dantzler had "no instability, slight swelling, [and] good ROM [range of motion]." R. Doc. 22, at 11. Dr. Dehner diagnosed Dantzler with a "knee sprain"; ordered "rehab exercises [for] 6 weeks"; and prescribed diclofenac, a non-steriodal anti-inflammatory drug. *Id.* On April 16, 2020, Dr. Dehner reported that Dantzler was "not taking med as directed" and attributed some of Dantzler's continued discomfort to "[n]oncompliance with medicine regimen." *Id.* at 13.

On July 6, 2020, Dantzler reinjured his knee playing basketball; he saw a nurse that same day. The nurse reported that Dantzler limped and "was not wearing his knee brace." *Id.* at 15. The nurse noted swelling in Dantzler's right knee. Dantzler had an "active range of motion" but experienced pain moving the knee. *Id.* Dantzler "rated his pain at a[n] 8 on a scale of 0 to 10." *Id.* The nurse consulted with Dr. Dehner. Dr. Dehner then issued the following directions for Dantzler: He should (1) wear the issued knee brace, (2) not participate in sports for 90 days, and (3) return for a follow-up after a week. After consulting with Dr. Dehner, the nurse passed along Dr. Dehner's directions and told Dantzler to put ice on his knee to treat the swelling.

On July 16, 2020, Dr. Dehner again examined Dantzler. Dr. Dehner observed that Dantzler's knee was "more swollen than last time," noted that Dantzler had "[f]elt a pop" when he reinjured his knee, and reported that Dantzler had "medial joint line tenderness, no instability." *Id.* at 18. He continued his orders for rest, ice, a non-steriodal anti-inflammatory drug, rehabilitation, and no sports.

On December 27, 2020, Dantzler reported, "[I] have severe pain in my right knee—it[']s been this way since [F]ebruary. . . . [I] would like an MRI done [because] [I] [am] certain there is some structural damage. [I] can sometimes barely walk." *Id.*

at 22. Three days later, a nurse examined Dantzler and noted that his "right knee . . . appeared swollen" but was "not warm to the touch." *Id.* at 23. She continued Dantzler's care plan, referred him to a doctor, and advised him to use his knee brace.

On January 6, 2021, Dantzler was transferred to CCF. Dr. Tonia Baldwin examined Dantzler two days later. She observed that Dantzler was "not wearing the knee[]sleeve." *Id.* at 25. Dantzler attributed the lack of use of the sleeve to the prison's transfer protocols. He reported that his knee sleeves and ibuprofen were removed from his possession.

During her exam, Dr. Baldwin observed "marked swelling around the knee" and "swelling of the infrapatella bursa." *Id.* She found "[n]o meniscal tear on exam." *Id.* She directed Dantzler to wear the knee sleeve and take ibuprofen for two weeks. When she asked Dantzler "how many [ibuprofen] pills he ha[d] left, he state[d] none" because "he did not get them back when he came to CCF." *Id.* at 26. She noted that if the swelling in Dantzler's knee was not down after the two-week period, then she would consider aspiration or a cortisone injection. But if the swelling was down, she would order physical therapy. She ordered that Dantzler have a lower bunk assignment, restricted his physical activity for one month, and advised that he may have a "[b]race/[w]alker" and a "knee stabilized brace" in his possession. *Id.*

On January 22, 2021, at a follow-up appointment, Dantzler reported that his knee "fe[lt] close to the same as the last time he was seen." *Id.* at 28. But Dr. Baldwin found "marked improvement in the knee" with only slight swelling. *Id.* She noted that Dantzler was only taking ibuprofen one to two times a day because it "hurt his stomach." *Id.* She advised him to take the ibuprofen with food to aid with the "stomach discomfort" and renewed the ibuprofen for two more weeks. *Id.*

On February 28, 2021, Dantzler reported injuring his knee again. He stated that his knee "made a popping noise" while he was "walking laps" and that his knee was

swollen again. *Id.* at 30. He stated his belief that his knee was more than sprained because "it[']s been injured since [F]ebruary of [2020]." *Id.* The nurse observed that Dantzler was "ambulating with steady gait. No limping, guarding or grimacing." *Id.* She did, however, note that Dantzler's "[r]ight knee ha[d] edema on outer aspect," he had "[c]repitus . . . with movement," and his knee was "tender on outer aspect." *Id.* The nurse issued Dantzler ibuprofen, restricted his sports activity for two weeks, and scheduled an appointment for Dantzler to see the doctor. She also commented, "Of note [Dantzler] was not wearing knee brace today." *Id.*

On March 3, 2021, Dr. Baldwin examined Dantzler. He described that, while walking, he went to take a step, and a pain went through his knee, making him unable to extend it. According to Dantzler, "there was a pop." *Id.* at 32. He reported that his knee had "swelled by night." *Id.* Dantzler explained that it hurt to "pivot [his] leg/knee to put on his socks" and that the pain was "a sharp stinging kind of pain." *Id.* Dr. Baldwin observed that Dantzler's "ligaments cont[inued] to be intact" with "NO meniscal tear on exam." *Id.* But she did note "[e]dema, "[i]nflam[m]ation," and "[j]oint [t]enderness." *Id.* Dr. Baldwin diagnosed Dantzler with "bursitis." *Id.* She ordered him to "cont[inue] with the knee[]sleeve (which he [was] wearing)." *Id.* She also gave him "leg strengthening exercises to perform daily" and increased his ibuprofen dosage. *Id.*

On March 30, 2021, Dantzler again saw Dr. Baldwin. He advised her that his "knee [was] not healed," he did "not want to give back his knee brace," and he "shouldn't have to return [his] knee brace if [he was] still having pain." *Id.* at 37. Dr. Baldwin noted "slight swelling on either side of the proximal patella and slight swelling in the infrapatella bursa." *Id.* She reconfirmed her diagnosis of "knee bursitis." *Id.* at 38. She observed that Dantzler was not currently wearing the knee sleeve but "need[ed] to cont[inue] with it." *Id.* Additionally, Dantzler had not been taking the ibuprofen. He told Dr. Baldwin that he was "tired of taking [ibuprofen] b[ecause] it is all he has been given for the past year whether he has knee pain, toothache, etc." *Id.* According to Dr. Baldwin, not taking the ibuprofen "ma[de] it

-5-

longer to resolve the knee bursitis." *Id.* Dr. Baldwin permitted Dantzler to keep the knee brace for another month.

Dantzler disputes Dr. Baldwin's implication that he was noncompliant with treatment. He explains that he "took [the] knee sleeve off before going to 'every' [h]ealth [s]ervice[s] appointment . . . . because it was easier to show his knee/injury if he had on jeans or sweatpants, because short[s] are not allowed to be worn in [the] Health Service[s] Department." R. Doc. 46, at 27. He also challenges Dr. Baldwin's assertion that he was not taking the ibuprofen. According to Dantzler, "It is not possible for [Dr.] Baldwin to monitor if/when I am taking the issued [ibuprofen], because . . . . I took it in my cell as required." *Id.*

On April 29, 2021, Dantzler saw Dr. Baldwin for continued right knee pain. His "[right] knee cont[inued] to swell off and on" and was "worse when he [went] to stand up from sitting." R. Doc. 22, at 40. The pain also "increase[d] when he trie[d] to do the [physical therapy] exercises." *Id.* Dantzler asked to keep the knee sleeve. Dr. Baldwin observed that Dantzler was "not wearing the knee sleeve" but that "one is able to see where the knee sleeve had been. W[h]en he stands, there is swelling above the patella on the lateral side." *Id.* Dr. Baldwin maintained her diagnosis of bursitis in Dantzler's right knee and noted his continued need for the knee sleeve and ibuprofen. Additionally, Dr. Baldwin wrote in her notes, "[Dantzler] to kite if he gets laid down[2] in October so that referrals to UIHC can be entered. If laid down, will order MRI and ortho referral." *Id.*

Dantzler denies ever telling Dr. Baldwin that he was due for parole in October 2021. According to Dantzler:

---

[2]The term "laid down" refers to denial of parole. *See* R. Doc. 21-3, at 32.

Plaintiff did not state that he was up for parole in October. Plaintiff also did not agree to this course of action. These comments are fictitious and unsupported. During this encounter the defendant ([Dr.] Baldwin) said "there [is] no way your knee is still swelling like this—I think we need to schedule you for MRI and ortho." After checking the plaintiff's chart[,] she states[,] "I see you get ran up for parole in October[.] [I]f you get laid down[,] I'll schedule you for MRI and ortho." The plaintiff never agreed to this[.] [W]hen [he] asked "why he had to wait (6) months when it[']s evident there[']s a problem now[,]" [Dr.] Baldwin ignored him and continued [to] type on her computer.

R. Doc. 46, at 28.

Dr. Baldwin responds that she "discussed [her] referring [Dantzler] to University of Iowa Hospitals and Clinics (UIHC) for an MRI and orthopedist appointment if he was 'laid down'—not paroled—in October. [He] agreed to this course of action." R. Doc. 21-3, at 32. But Dantzler replies that he "continually asked for an MRI" and that such action "is not consistent with an individual that agreed to wait." R. Doc. 46, at 55. Dr. Baldwin also states that

it did not make sense to set an appointment for him after he was expecting to be released, as he stated he was not going to follow up at UIHC after his release; and even if he could be seen initially before his release he would almost certainly have to get another MRI if further treatment was necessary, again due to his indicating he would not follow up at UIHC.

R. Doc. 21-3, at 34–35. Dantzler, however, denies making this statement. He avers that he was never asked whether he would follow up at UIHC and notes that there is no notation in the medical records to support Dr. Baldwin's statement regarding follow-up treatment at UIHC.

-7-

On June 2, 2021, Dantzler requested and was issued more ibuprofen.

On July 23, 2021, Dr. Baldwin did not see Dantzler but renewed his use of a knee brace. She also noted, "If [Dantzler] got laid down from parole, need referral, see April notes." R. Doc. 22, at 44.

On July 29, 2021, Dantzler sent a kiosk message to Health Services, stating that he had been called to return his knee brace even though he still had "quit[e] a bit of fluid in [his] knee" and "excruciating pains in the morning." R. Doc. 21-3, at 22. He indicated that his knee pain had "been an on-going problem [for] 2 years now" and stated that "if an MRI was done. . . all [his] pain w[ould] be clearly evident." *Id.* The following day, Dr. Baldwin replied that Dantzler could "have the knee brace through October." *Id.* She also wrote, "Per our last discussion, you wanted to wait for MRI to be done if you did not get parole. If this has changed, let me know." *Id.*

On August 18, 2021, Dantzler requested ibuprofen for his knee and back. Dantzler was issued a seven-day supply of ibuprofen. Two days later, Dantzler made a sick call request, stating, "The pain in my knee is getting severe. I've sent several kites concerning this issue. I need an MRI done ASAP." R. Doc. 22, at 47. According to Dantzler, he had spoken with two other nurses informally about his pain, but nothing was done. Dantzler asserted:

> This is my final attempt at resolving this issue formally. I was told I would get an MRI in Sept[ember] if I don't get release[d]. My release date shouldn't have anything to do with receiving proper health care. Medical staff is being deliberately indifferent to my serious medical need as the[y] know my knee has been injured (over a year). Yet still are denying me medical care adequately.

*Id.* The responding nurse commented that Dantzler's knee brace was confiscated because of Dantzler's placement in administrative segregation and would not be

returned to him until an investigation was completed. The nurse issued Dantzler a knee sleeve until his knee brace could be returned. She also issued him ibuprofen. The nurse also noted, "The doctor said you are to kite health services if you get laid down in October so that referrals to UIHC can be entered. If you are laid down, the order for an MRI and ortho referral will be made." *Id.*

On August 25, 2021, a nurse saw Dantzler for "cold symptoms." *Id.* at 49. He also stated, "I really need to talk about my knee. I need an MRI. I [have] been telling you for months. I need crutches or something." *Id.* According to the examining nurse, two other nurses had observed Dantzler as he entered and left health services and reported "[n]o change in gait . . . . Gait steady and even." *Id.* But Dantzler counters that he could not have been observed entering or leaving health services "because he was escorted in through the back door (by C/O Barry)." R. Doc. 46, at 33. He states that he "didn't encounter any medical staff until they entered the room he was placed in." *Id.* He contends that "[v]ideo evidence will show that [he] did indeed walk with a limp." *Id.*

On August 31, 2021, Dantzler filed a formal grievance. He alleged that he was "[b]eing [d]enied [m]edical [s]ervices . . . [d]eliberately" and wanted an "'MRI'—asap!!!" R. Doc. 21-3, at 41 (ellipsis in original). Melissa Farnsworth, CCF Health Services Director, was on COVID-related leave from that position for approximately three weeks from mid-August 2021 until early September 2021. In her absence, Dantzler sent multiple requests for medical care, noting increased pain in his right knee. *See* R. Doc. 22, at 51 ("Well I sent a lot of kites and they weren't returned. Well they said they would fax them to you to return to me. . . . Well I still want to file a grievance.").

On September 9, 2021, Dantzler complained that his "pain [was] getting worse." *Id.* Farnsworth visited Dantzler in his cell. Farnsworth commented that Dantzler agreed "in April when he saw the doctor he was ok with waiting a while for an MRI

or to see Ortho, but now that the pain has increased he wants to be seen." *Id.* But Dantzler denies he ever agreed to wait but instead repeatedly requested an MRI. R. Doc. 46, at 34–35 (stating that Dantzler demanded an MRI on July 29, August 20, August 25, August 31, October 4, and November 3, 2021, and "also requested an MRI verbally on several occasions"). Farnsworth scheduled Dantzler to see Dr. Baldwin the following week.

On September 16, 2021, Dantzler saw Dr. Baldwin. Dr. Baldwin's notes indicate that Dantzler complained of "worsening [right] knee pain," an inability to "extend the knee out" in the morning, and an inability "to squat down" without pain in both knees. R. Doc. 22, at 52. Dr. Baldwin noted that Dantzler was "wearing the knee[]sleeve" and that there was "[n]o swelling in the knee today." *Id.* She indicated that Dantzler was in administrative segregation, that it was "[u]nlikely that he will have his parole granted," and that she would "order [an] MRI [on the] [right] knee." *Id.* She "encouraged [Dantzler] to take [ibuprofen] for the pain." *Id.* Consistent with her notes, Dr. Baldwin did order that Dantzler receive an MRI at UIHC. Dr. Baldwin requested that Dantzler be "evaluate[d] for etiology and treatment options." *Id.* at 54.

On September 21, 2021, Dantzler was transferred to the Iowa State Penitentiary (ISP). On October 14, 2021, he was denied parole.

On September 27, 2021, Blythe Larson, CCF Treatment Director, denied Dantzler's August 31, 2021 grievance. She stated, "Due to the length of wait for an MRI at UIHC, Dr. Baldwin did not schedule you until you received your BOP decision because you would not have been able to go to the appointment due to your release." R. Doc. 21-3, at 46. Additionally, she stated, "It is the doctor's determination when someone is referred to UIHC and also regarding bunk restrictions[,] and I cannot override that as this is her area of expertise." *Id.*

On October 4, 2021, Dantzler appealed Larson's grievance denial. In his appeal, he stated that he wanted "an 'MRI' done on both knees and hip . . . ASAP!!!" *Id.* at 47 (ellipsis in original). On October 18, 2021, Stephen Weis, CCF Warden, denied Dantzler's grievance appeal. He agreed with Larson that it was for the doctor to determine when someone is referred to UIHC. Ten days later, Dantzler appealed this denial to the central office and again requested an MRI on both knees and hip. This appeal was also denied.

On November 5, 2021, UIHC Orthopedist Laura Magrane, PA-C, examined Dantzler. An MRI revealed "MFC cartilage defect, joint effusion, [and] medial meniscal tear (possible root)." R. Doc. 22, at 60. After discussing surgical and nonsurgical options with Magrane, Dantzler "[c]onsented . . . for a right knee arthroscopy, meniscal repair versus debridement and microfracture." *Id.* According to Dantzler, he also told Magrane about the pain in his left knee; however, because she only had orders to treat his right knee, she did not order an MRI or x-ray for his left knee. Dantzler avers that Magrane "informed [him] that looking at the present damage the surgery was not a permanent fix, and he would like[ly] need a knee replacement in the next 2–3 years." R. Doc. 46, at 61.

On January 12, 2022, Dantzler had surgery on his right knee at UIHC.

On May 4, 2022, Dantzler reported having pain in his left knee. In his sick call, he stated that his left knee was swollen and the pain was increasing "off and on." R. Doc. 22, at 74. Dantzler was "certain there [was] something wrong with it." *Id.* He believed that his left knee felt similar to how his right knee felt when the meniscus was torn, describing it as "grinding, and swelling more and more with most activity and sometimes even walking." *Id.* Dantzler was already scheduled for a follow-up appointment at UIHC on May 11, 2022. The physician at ISP prepared orders for Dantzler to be seen for both knees at that appointment. Additionally, he ordered an x-ray of Dantzler's left knee for May 5, 2022.

On May 11, 2022, Magrane examined Dantzler and observed swelling in his left knee. She also ordered an MRI of his left knee. According to Dantzler, Magrane "again explain[ed] to [him] that he had a torn meniscus and additional surgery [was] needed" on his left knee. R. Doc. 46, at 17. Dantzler had surgery on his left knee on August 10, 2022.

On August 24, 2022, two days before his left-knee, post-surgical appointment with UIHC, Dantzler requested to have an MRI on his hip while he was there. He reported having pain in his hip when he sat for a period of time and then stood. No MRI was ordered because there was no documentation of any hip issue and because it was too near the appointment.

On August 26, 2022, Magrane saw Dantzler for his follow-up appointment. He was released with no restrictions and was scheduled to begin therapy in two weeks. At his appointment, Dantzler told Magrane about his "'tailbone' pain that has been ongoing for several years and report[ed] that likely started after a fall directly backwards on his buttock." R. Doc. 22, at 82. He reported "pain in the tailbone on sitting, especially when leaning back" and "an abrupt increase in pain during the transition from sitting to standing." *Id.* Magrane discussed treatment options with Dantzler regarding his tailbone and indicated that "[i]f symptoms persist[,] x-ray of the coccyx should be completed and possible consideration of MRI to rule out other pathology." *Id.* at 83.

On September 15, 2022, Dantzler complained of hip, tailbone, or pelvis pain upon standing. He attributed this pain to the fall from 2021 that he had also reported to Magrane. Four days later, Dantzler "report[ed] right knee pain." *Id.* at 88. Dantzler told Dr. Chase Newton at ISP that "[d]ue to compensating from his right leg[,] he started getting left knee pain. He ended up falling and landed on his tailbone. When he sits or stands up[,] he has pain that shoots from his tailbone throughout his pelvis." *Id.* Dr. Newton ordered x-rays of Dantzler's pelvis and tailbone and gave permission

-12-

for Dantzler to have a donut cushion for his symptoms. On September 26, 2022, Dr. Newton reviewed the x-rays and observed no fractures; but he did note arthritis of Dantzler's hip joints. He did not see any "other significant abnormalities" on the x-rays. *Id.* at 90.

Dantzler filed a pro se complaint under 42 U.S.C. § 1983 against CCF prison officials, including Dr. Baldwin, for violation of his Eighth Amendment rights. The district court conducted an initial review of the complaint. *See* 28 U.S.C. § 1915A(a). The district court narrowed Dantzler's claims to one claim for deliberate indifference to a serious medical need related to the delayed treatment of Dantzler's right knee.

The CCF prison officials moved for summary judgment based on qualified immunity. The district court granted in part and denied in part their motion. Specifically, the court dismissed all claims asserted against the CCF prison officials, except for Dr. Baldwin.

The court framed the issue as "whether [Dr. Baldwin's] subsequent decision to delay [Dantzler's] referral was based on nonmedical considerations, namely, whether Dantzler would be paroled." R. Doc. 52, at 21. The court concluded that "Dantzler has created a material fact issue as to whether [Dr.] Baldwin was deliberately indifferent to his knee pain by delaying the MRI and orthopedic referral based on his parole eligibility." *Id.* The district court further concluded that Dr. Baldwin was not entitled to qualified immunity because "cases clearly establish [that] the intentional denial or delay of access to medical care may violate the Eighth Amendment" and "that a delay in care based on nonmedical considerations may also violate the Eighth Amendment." *Id.* at 24–25. According to the court, "a reasonable official in [Dr.] Baldwin's shoes would have understood that a delay in referring Dantzler for an orthopedic consultation and MRI based on whether he was eligible for parole would be a violation of his Eighth Amendment rights." *Id.* at 25.

-13-

## II. *Discussion*

Dr. Baldwin argues that the district court erred in denying her motion for summary judgment based on qualified immunity. She asserts that she "is entitled to qualified immunity primarily for two reasons": (1) her "actions were not deliberately indifferent to any serious medical need," and (2) "neither the district court nor Dantzler identified any case clearly establishing that Dr. Baldwin's conduct was deliberately indifferent." Appellant's Br. at 20–21.

We review de novo the district court's denial of qualified immunity. *Fisherman v. Lauderville*, 100 F.4th 978, 980 (8th Cir. 2024). "We have limited interlocutory review in qualified-immunity cases, meaning we lack jurisdiction to decide factual issues, including whether the pretrial record sets forth a genuine issue of fact for trial." *Id.* (internal quotation marks omitted). As a result, we must affirm "when it is apparent that, if the plaintiff's version of the facts is right, the officer violated a clearly established right." *N.S. v. Kan. City Bd. of Police Comm'rs*, 933 F.3d 967, 969 (8th Cir. 2019).

We have jurisdiction to determine pure issues of law. *Fisherman*, 100 F.4th at 980. "Two arise frequently. First, accepting the district court's factual findings as true, did the defendant violate a constitutional right? And second, was the right clearly established at the time? If either answer is no, then qualified immunity applies." *Id.* (cleaned up). In other words, reversal of the district court's denial of qualified immunity is warranted when, "under the plaintiff-friendly version of the facts, there was no constitutional violation or the underlying right was not clearly established." *N.S.*, 933 F.3d at 969.

## A. *Constitutional Violation*

Dantzler's deliberate-indifference claim is based on the Eighth Amendment. "The Eighth Amendment requires state prison officials to provide inmates with needed medical care." *Cullor v. Baldwin*, 830 F.3d 830, 836 (8th Cir. 2016). "[D]eliberate

indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Redmond v. Kosinski*, 999 F.3d 1116, 1120 (8th Cir. 2021) (alteration in original) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). "Deliberate indifference is more than negligence, more even than gross negligence. It may be found where medical care is so inappropriate as to evidence intentional maltreatment." *Presson v. Reed*, 65 F.4th 357, 366 (8th Cir. 2023) (internal quotation marks omitted); *see also Redmond*, 999 F.3d at 1120 (stating that the plaintiff "must show grossly incompetent or inadequate care so inappropriate as to evidence intentional maltreatment or a refusal to provide essential care" (internal quotation marks omitted)). "The level of culpability required to demonstrate deliberate indifference on the part of prison officials is equal to criminal recklessness." *Holden v. Hirner*, 663 F.3d 336, 343 (8th Cir. 2011).

"Deliberate indifference has both an objective and a subjective component." *Cheeks v. Belmar*, 80 F.4th 872, 876 (8th Cir. 2023) (internal quotation marks omitted), *cert. denied sub nom. Jakob v. Cheeks*, 144 S. Ct. 1030 (2024). To prevail on a deliberate-indifference claim, "[t]he plaintiff must show (1) an objectively serious medical need, and (2) that the defendant knew of and disregarded that need." *Redmond*, 999 F.3d at 1120 (internal quotation marks omitted).

### 1. *Serious Medical Need*

Dr. Baldwin argues that Dantzler failed to show that he suffered from an objectively serious medical need because, "[a]t the time of the alleged delay in medical care, Dantzler's right knee was not diagnosed by a physician as requiring treatment. It was diagnosed as inflammation requiring conservative management, including anti-inflammatory medication, rehab exercises, a knee sleeve and restrictions." Appellant's Br. at 29. According to Dr. Baldwin, "A layperson would not have identified the necessity for a doctor's attention. Nothing showed that Dantzler's right knee [had something] seriously wrong [with it]." *Id.* Dr. Baldwin also argues that "to the extent Dantzler's allegations rely on a theory of delays in treatment having caused

him harm, he has not provided verifying medical evidence sufficient to support his claims." *Id.* at 31.

"A serious medical need is one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Cheeks*, 80 F.4th at 878 (internal quotation marks omitted). But where, as here, an inmate "alleges that a *delay* in medical treatment constituted a constitutional deprivation, the objective seriousness of the deprivation *should also* be measured by reference to the effect of delay in treatment." *Id.* (internal quotation marks omitted). "To establish this effect, the inmate must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment." *Jackson v. Riebold*, 815 F.3d 1114, 1119–20 (8th Cir. 2016) (cleaned up); *see also Cheeks*, 80 F.4th at 878 ("In other words, if a plaintiff is relying on a delay in treatment theory, there is an additional requirement to place verifying medical evidence in the record to show there was a detrimental effect caused by the delay."); *Presson*, 65 F.4th at 366–67 (stating that the inmate "must present verifying medical evidence that the prison officials ignored an acute or escalating situation or that these delays adversely affected his prognosis" (quoting *Redmond*, 999 F.3d at 1121)).

An inmate's "failure to place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment precludes a claim of deliberate indifference to medical needs." *Cheeks*, 80 F.4th at 878; *see also Laughlin v. Schriro*, 430 F.3d 927, 929 (8th Cir. 2005). But "what constitutes verifying medical evidence"? *Williams v. Liefer*, 491 F.3d 710, 715 (7th Cir. 2007). "Clearly, expert testimony that the plaintiff suffered because of a delay in treatment would satisfy the requirement." *Id.* (citing *Coleman v. Rahija*, 114 F.3d 778, 785 (8th Cir. 1997) (concluding that expert testimony satisfied the verifying medical evidence requirement)). By contrast, "self-reported assertions of pain are insufficient" to "constitute . . . verifying medical evidence" in the absence of "corroborating evidence

of symptoms." *Hancock v. Arnott*, 39 F.4th 482, 487 (8th Cir. 2022). Additionally, "evidence of a plaintiff's diagnosis and treatment, standing alone, is insufficient *if it does not assist the jury in determining whether a delay exacerbated the plaintiff's condition or otherwise harmed him*." *Williams*, 491 F.3d at 715 (emphasis added).

An inmate's failure to "introduce expert testimony stating that his medical condition worsened because of the delay . . . does not mean [the inmate] offered no verifying medical evidence." *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008) (citing *Williams*, 491 F.3d at 715). An inmate may satisfy this requirement by "suppl[ying] medical records." *Id.*; *see also Miranda v. County of Lake*, 900 F.3d 335, 347 (7th Cir. 2018) ("While expert testimony could be used as 'verifying medical evidence,' medical records alone could suffice." (citing *Grieveson*, 538 F.3d at 779; *Williams*, 491 F.3d at 715)). For example, in *Williams*, the inmate alleged that an hours-long delay in proper medical care unnecessarily prolonged his pain and high blood pressure. 491 F.3d at 712–13. The inmate had awakened with chest pain, arm numbness, dizziness, nausea, and vomiting. *Id.* at 712. He complained several times about his pain and symptoms to three prison officers, none of whom granted his request for medical treatment. *Id.* at 712–13. In the afternoon, while carrying a heavy box up a flight of stairs, the inmate blacked out and fell backwards down the stairs. *Id.* at 713. He was sent to the prison emergency room. *Id.* When seen there, he had high blood pressure, an elevated pulse, and an abnormal heart rate. *Id.* He remained in the prison infirmary for six days. *Id.* Thereafter, he filed a deliberate-indifference claim against the prison officers. *Id.* at 714.

The prison officers' medical expert, who was the inmate's examining physician, "testified that any delay in treatment '[did not] appear to have had any significant adverse effect' on [the plaintiff's] condition." *Id.*(first alteration in original). The inmate did not introduce expert testimony in support of his deliberate-indifference claim; instead, he relied on the medical records from when he arrived at the hospital. *Id.* at 715. The medical records and examining physician's testimony "showed that

-17-

when [the inmate] arrived at the hospital, he had elevated blood pressure, had an abnormal EKG, was sweating, and complained of severe pain." *Id.* Additionally, the medical records demonstrated "that with treatment, [the inmate's] symptoms, including his pain and high blood pressure, quickly subsided." *Id.* "The only testimony from a medical expert, [the examining physician], was that the delay did not appear to have adversely affected [the inmate's] condition." *Id.*

The Seventh Circuit held that "a reasonable jury could have concluded from the medical records that the delay unnecessarily prolonged and exacerbated [the inmate's] pain and unnecessarily prolonged his high blood pressure." *Id.* at 716. The court noted that "[t]he medical records indicate that the nitroglycerin almost immediately relieved his pain and lowered his blood pressure, so a jury could find that the defendants' delay caused [the plaintiff] six extra hours of pain and dangerously elevated blood pressure for no good reason." *Id.*; *see also Grieveson*, 538 F.3d at 779 (holding that although pretrial detainee did not provide expert testimony, he produced verifying medical evidence by "suppl[ying] medical records indicating that he had a nasal fracture, that he could experience further bleeding, and that he may need to see a specialist").

In the present case, Magrane diagnosed Dantzler's knee condition on November 5, 2021. The MRI showed that Dantzler had an "MFC cartilage defect, joint effusion, medial meniscal tear (possible root)." R. Doc. 22, at 60. He underwent knee surgery to repair the meniscal tear on January 12, 2022. But Dr. Baldwin argues that Dantzler's right knee injury was not objectively serious at the time of the alleged delay in medical care—April 29, 2021. The district court found a genuine issue of material fact based on Dantzler's testimony. He testified that, on that date, Dr. Baldwin told him, "there [is] no way your knee is still swelling like this—I think we need to schedule you for MRI and ortho." R. Doc. 46, at 28. Additionally, Dantzler avers that he "described every symptom of a [t]orn [m]eniscus to her," *id.* at 65, including pain, swelling, a popping sensation, and difficulty standing and pivoting, *id.* at 65–66. And he maintains that "there was only one month" during a nine-month period when he did

-18-

not complain about his knee. *Id.* at 56. Under Dantzler's version of the facts, Dr. Baldwin was aware that Dantzler's knee injury was objectively serious enough to warrant an MRI as of April 29, 2021.

Additionally, we conclude that Dantzler produced verifying medical evidence that the delay in medical treatment adversely affected his condition. As in *Williams* and *Grieveson*, the evidence "falls somewhere in between a bare recitation of treatment received and expert testimony about the delay's effect." *Grieveson*, 538 F.3d at 779 (quoting *Williams*, 491 F.3d at 715). Like the plaintiffs in those cases, Dantzler "relies on the existing medical records to corroborate his claims that the delay in treatment caused him prolonged pain as well as the need to have surgery on his left knee." R. Doc. 52, at 22. Dr. Baldwin told Dantzler, at his April 29, 2021 examination, that he needed an MRI based on his knee's continued swelling. *See* R. Doc. 46, at 28. Afterwards, the medical records show that Dantzler consistently complained of worsening knee pain and renewed his requests for an MRI; in response, the CCF medical staff treated his condition with knee braces and ibuprofen. *See, e.g.*, R. Doc. 22, at 43 (June 2, 2021); *id.* at 44 (July 23, 2021); *id.* at 46 (August 18, 2021); *id.* at 47 (August 20, 2021); *id.* at 49 (August 25, 2021); *id.* at 51 (September 9, 2021); *id.* at 52 (September 16, 2021); *see also* R. Doc. 21-3, at 22 (July 29, 2021). Ultimately, he was referred for an MRI and underwent surgery on his right knee but only after he was denied parole.

The medical records also show that, after the surgery on his right knee, Dantzler complained of increased swelling and pain in his left knee on May 4, 2022. R. Doc. 22, at 74. He was referred to UIHC for an x-ray and to have both knees examined. *Id.* He had surgery on his left knee on August 10, 2022. *Id.* at 80. Following that surgery, Dr. Newton saw Dantzler at ISP for tailbone pain on September 19, 2022; Dr. Newton's notes indicate:

> [Dantzler] reports right knee pain. He had torn meniscus and microfracture of his right femur. *Due to compensating from his right leg*

he started getting left knee pain. He ended up falling and landed on his tailbone. When he sits or stands up he has pain that shoots from his tailbone throughout his pelvis.

*Id.* at 88 (emphasis added).

## 2. *Deliberate Disregard*

"We now turn to the subjective prong of the inquiry. Under the subjective prong, to show deliberate indifference, the official must know of and disregard the inmate's serious medical need." *Presson*, 65 F.4th at 367 (internal quotation marks omitted). The plaintiff must show "that the [defendants] recognized that a substantial risk of harm existed *and* knew that their conduct was inappropriate in light of that risk." *Id.* (alteration in original) (internal quotation marks omitted).

"[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment." *Barr v. Pearson*, 909 F.3d 919, 921 (8th Cir. 2018) (alteration in original) (quoting *Estelle*, 429 U.S. at 106). An "*exercise of professional judgment*, even if negligent, falls well short of deliberate indifference." *A.H. v. St. Louis County*, 891 F.3d 721, 727 (8th Cir. 2018) (emphasis added). Thus, it "is not enough" for an inmate to "[s]how[] medical malpractice." *Barr*, 909 F.3d at 921. Instead, the "inmate must show that the provider disregarded a known risk to the inmate's health." *Id.* (internal quotation marks omitted); *see also Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015) ("Prison physicians will be liable under the Eighth Amendment if they intentionally disregard a known, objectively serious medical condition that poses an excessive risk to an inmate's health." (internal quotation marks omitted)). "As long as this threshold is not crossed, inmates have no constitutional right to receive a particular or requested course of treatment . . . ." *Redmond*, 999 F.3d at 1120 (internal quotation marks omitted). "[N]othing in the Eighth Amendment prevents prison doctors from exercising their independent medical judgment . . . .[, and] [p]rison officials do not violate the Eighth Amendment when, *in the exercise of their professional judgment*, they refuse to

implement a prisoner's requested course of treatment." *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996) (emphasis added); *see also Holloway v. Del. Cnty. Sheriff*, 700 F.3d 1063, 1074 (7th Cir. 2012) (stating that prison doctor "is free to make his own, independent medical determination as to the necessity of certain treatments or medications, *so long as* the determination is based on the physician's *professional judgment* and does not go against accepted professional standards" (emphases added)).

"A plaintiff can show deliberate indifference in the level of care provided in different ways, including showing grossly incompetent or inadequate care, showing a defendant's decision to take an easier and less efficacious course of treatment, or showing a defendant *intentionally delayed* or denied *access to medical care*." *Allard v. Baldwin*, 779 F.3d 768, 772 (8th Cir. 2015) (emphases added) (citations omitted). We have previously held that "'mere proof of medical care' is insufficient to disprove deliberate indifference." *Id.* (quoting *Smith v. Jenkins*, 919 F.2d 90, 93 (8th Cir. 1990)). "[E]ven where medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by *delaying* the treatment of serious medical needs, . . . though the reason for the delay and the nature of the medical need is relevant in determining what type of delay is constitutionally intolerable." *Farrow v. West*, 320 F.3d 1235, 1246 (11th Cir. 2003) (emphasis added) (internal quotation marks omitted); *see also Allard*, 779 F.3d at 772 ("[I]n cases where *some medical care is provided*, a plaintiff is entitled to prove his case by establishing the course of treatment, or lack thereof, so deviated from professional standards that it amounted to deliberate indifference." (cleaned up)); *Langford v. Norris*, 614 F.3d 445, 460 (8th Cir. 2010) ("[A] total deprivation of care is not a necessary condition for finding a constitutional violation . . . .").

If this case concerned only the physician's medical judgment in delaying treatment, deliberate indifference could not be shown. This record, however, also involves the physician's nonmedical reasons for delay. We have recognized that a prison official "*delaying* medical treatment for '*nonmedical reasons*' may amount to

deliberate indifference." *Cannon v. Dehner*, 112 F.4th 580, 591 (8th Cir. 2024) (emphases added) (quoting *Hartsfield v. Colburn*, 371 F.3d 454, 457 (8th Cir. 2004)); *see also Morris v. Cradduck*, 954 F.3d 1055, 1059 (8th Cir. 2020) ("Delaying access to prescribed medical care for non-medical reasons may constitute deliberate indifference in certain circumstances."). For example, in *Hartsfield*, we reversed summary judgment in favor of a jail doctor who had withheld treatment of a pretrial detainee's[3] toothache for six weeks "for nonmedical reasons—[the detainee's] behavioral problems." 371 F.3d at 457. When the detainee initially requested treatment for "a severe toothache and three loose teeth," the jail doctor "prescribed ibuprofen but was hesitant to send [the detainee] to a dentist right away because [j]ail records showed that [the detainee] had previously exhibited threatening and argumentative behavior." *Id.* at 456. Approximately six weeks later, the detainee "finally received treatment from a dentist who told [the detainee] that the delay had caused a bad infection in his mouth." *Id.* In a verified statement, the detainee stated "that he did not receive ibuprofen and that while he was awaiting treatment, blood seeped from his gums, his mouth became swollen, an infection developed, and he had difficulty eating and sleeping." *Id.* Additionally, he claimed that "he encountered [the jail doctor] in a hallway and requested treatment, but when he identified himself, [the jail doctor] walked away and said, 'I can't talk to you.'" *Id.*

We held that there was a question of material fact regarding "whether . . . [the jail doctor] w[as] deliberately indifferent to [the detainee's] serious medical needs when [he] failed to arrange for dental treatment until about six weeks after [the detainee's] written request for it, causing him to suffer further pain and infection." *Id.* at 457. We concluded that the jail doctor's "statement . . . demonstrated that [the jail doctor] was made aware of [the detainee's] pain when he reviewed the medical request, but he withheld dental treatment for nonmedical reasons—[the detainee's] behavioral problems." *Id.*; *see also Chance v. Armstrong*, 143 F.3d 698, 704 (2d Cir.

---

[3]*Hartsfield*, 371 F.3d at 457 ("Pretrial detainees are entitled to at least as much protection under the Fourteenth Amendment as under the Eighth Amendment.").

1998) ("[The inmate] has also alleged that [the treating doctors] recommended extraction not on the basis of their medical views, but because of monetary incentives. This allegation of ulterior motives, if proven true, would show that the defendants had a culpable state of mind and that their choice of treatment was intentionally wrong and did not derive from sound medical judgment.").

Similarly, in *Delaughter v. Woodall*, the Fifth Circuit reversed summary judgment for a prison medical administrator where it was "not clear that [an orthopedic doctor's] cancellation of [the inmate's] surgery" and a medical center's refusal to accept the inmate as a patient were "medical-judgment decisions." 909 F.3d 130, 138 (5th Cir. 2018). In that case, the inmate sued a prison medical administrator for deliberate indifference after the orthopedic doctor that the inmate was referred to cancelled the inmate's hip replacement and reconstructive surgery. *Id.* at 135. The inmate claimed that the doctor "told him 'they'—presumably [the prison]—would not pay for his surgery, and [the inmate's] medical records reflect[ed] that [the doctor] told [the inmate] that [the inmate's] insurance would not pay for a CT scan or custom components." *Id.* at 139. At the time that the inmate filed suit "[b]ased on the delay in surgery," the inmate had yet to receive surgery. *Id.* at 135. But he had received some medical care both before and after the surgery was cancelled. *See id.* (stating that a prison doctor "treated [the inmate] with pain medication and steroid injections on at least four separate occasions" prior to the inmate's consultation with the orthopedic doctor and that, after the surgery's cancellation, the prison doctor "continued to treat [the inmate] with medication and steroid injections").

The Fifth Circuit held that "[f]actual disputes about the reason for the delay prevent[ed] [the court] from determining whether [the prison administrator] violated [the inmate's] constitutional rights," and as a result, the district court erroneously granted summary judgment in favor of the prison administrator. *Id.* at 139. The inmate produced evidence that the orthopedic doctor cancelled the inmate's surgery and the

medical center failed to accept the inmate as a patient "because [the prison] refuse[d] to pay for his surgery." *Id.* at 138.

Dr. Baldwin argues that Dantzler has failed to show that she acted with deliberate indifference. According to Dr. Baldwin, the record clearly shows that she "did not ignore Dantzler" because "[s]he saw him at multiple appointments and issued treatment plans to ameliorate his knee pain. She gave him ibuprofen and knee sleeves several times." Appellant's Br. at 30. She maintains that Dantzler's "non-compliance with his treatment plan makes it difficult to determine whether the issue would resolve with conservative treatment or if further intervention was necessary." *Id.* Dr. Baldwin also asserts that she did refer "Dantzler to UIHC for further treatment as soon as he requested that, following the disciplinary event that made his parole less likely." *Id.* She further argues that "to the extent there was a delay in moving to an alternative treatment, that decision was made in consultation with Dantzler." *Id.* at 30–31. She maintains that "Dantzler himself explained that he was not going to continue with treatment if he was released, and because he believed he would be released[,] Dr. Baldwin exercised medical judgment to remain on the conservative treatment plan." *Id.* at 31.

Proper summary judgment analysis requires that we construe the facts in Dantzler's favor. *See N.S.*, 933 F.3d at 969. Crediting Dantzler's version of the facts, we conclude that Dr. Baldwin did not "exercise" her "professional judgment" in deciding to delay Dantzler's MRI. *See A.H.*, 891 F.3d at 727; *Long*, 86 F.3d at 765; *see also Holloway*, 700 F.3d at 1074. Dr. Baldwin did provide "some medical care," but that fact does not foreclose Dantzler's deliberate indifference claim. *See Allard*, 779 F.3d at 772. Subject to a contrary determination at trial, Dr. Baldwin delayed Dantzler's MRI for a nonmedical reason—the possibility that he would be paroled. *See Cannon*, 112 F.4th at 591; *Hartsfield*, 371 F.3d at 457. As the district court explained:

Dantzler adamantly disputes Baldwin's version of events. He avers he never volunteered or otherwise stated he would be considered for

parole in October 2021. ECF No. 46 at 28. Moreover, he avers he never agreed to this course of action. *Id.* According to Dantzler, "[d]uring this encounter, [Baldwin] said, 'there is no way your knee is still swelling like this. I think we need to schedule you for MRI and ortho.'" *Id.* Dantzler avers Baldwin then checked his chart and saw he was scheduled for a parole review in October. *Id.* Baldwin told Dantzler if he is denied parole, she would schedule him for an MRI and an orthopedic appointment. *Id.* Dantzler contends he asked why he had to wait six months when the need for an MRI was immediate. *Id.* He avers Baldwin did not reply but "continued to type on her computer." *Id.* He argues it would have been inconsistent to agree to a delay in treatment given his repeated complaints of pain and requests for an MRI. *Id.* at 55.

Also according to Baldwin, "it did not make sense to set an appointment for him after he was expecting to be released, as he stated he was not going to follow up at [the University of Iowa] after his release." ECF No. 21-3 at 34–35. Dantzler disputes he declined to be treated at the University of Iowa after he was released. ECF No. 46 at 54. He avers he was never asked whether he would follow up at the University of Iowa, and argues there is no notation in the medical records to support Baldwin's statement regarding follow-up treatment at the University of Iowa. *Id.* at 53–54.

R. Doc. 52, at 20 (alterations in original). Additionally, Dantzler disputes Dr. Baldwin's implication that he was noncompliant with treatment. *See* R. Doc. 46, at 27 (explaining that he "took [the] knee sleeve off before going to 'every' [h]ealth [s]ervice[s] appointment . . . . because it was easier to show his knee/injury if he had on jeans or sweatpants, because short[s] are not allowed to be worn in [the] Health Service[s] Department"); *id.* (explaining that "[i]t [was] not possible for [Dr.] Baldwin to monitor if/when [Dantzler was] taking the issued [ibuprofen]" because it was issued to him to take in his cell as needed).

Based on Dantzler's account, Dr. Baldwin was aware of Dantzler's knee pain, recognized that his knee was still swelling and not improving yet "withheld [the MRI] for [a] nonmedical reason[]"— the possibility of Dantzler's parole. *See Hartsfield*, 471

-25-

F.3d at 457. In light of the conflicting accounts, it is "not clear" that Dr. Baldwin's decision to delay the MRI was a "medical-judgment decision[]." *See Delaughter*, 909 F.3d at 138.

### B. *Clearly Established*

"Proving the Eighth Amendment violation itself, however, is only half the battle. To overcome qualified immunity, [Dantzler] must show that every reasonable official in [Dr. Baldwin's] position would have understood that [delaying an MRI for the nonmedical reason of an inmate's possibility of parole] violated that right." *Fisherman*, 100 F.4th at 981 (cleaned up). In other words, Dantzler bears the burden of showing that the law is clearly established. *See Dean v. Bearden*, 79 F.4th 986, 989 (8th Cir. 2023).

> A plaintiff can show that law is clearly established in three ways. First, a plaintiff may identify existing circuit precedent involving sufficiently similar facts that squarely governs the situation. Second, a plaintiff may point to a robust consensus of cases of persuasive authority establishing that the facts of her case make out a violation of clearly established right. We do not consider a consensus based on the decision of a single circuit and a handful of lower courts to be robust. Finally, a plaintiff may show, in rare instances, that a general constitutional rule applies with obvious clarity to the facts at issue and carries the day for her.

*Hovick v. Patterson*, 37 F.4th 511, 517 (8th Cir. 2022) (cleaned up).

No matter how the plaintiff shows clearly-established law—existing circuit precedent, robust consensus of cases of persuasive authority, or an obvious case—that law must "clearly prohibit the [official's] conduct in the particular circumstances before him [or her]. The rule's contours must be so well defined that it is clear to a reasonable official that his [or her] conduct was unlawful in the situation he [or she] confronted." *Id.* (cleaned up). We undertake this inquiry "in light of the specific

context of the case, not as a broad general proposition." *Id.* (internal quotation marks omitted). "We must not define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Id.* (internal quotation marks omitted).

Applying these principles, we hold "that every reasonable official in [Dr. Baldwin's] position would have understood that [delaying an MRI for the nonmedical reason of an inmate's possibility of parole] violated" Dantzler's Eighth Amendment rights. *See Fisherman*, 100 F.4th at 981 (cleaned up). First, circuit precedent clearly establishes that an inmate can prove deliberate indifference by showing that a prison official "intentionally delayed . . . access to medical care." *Allard*, 779 F.3d at 772.

Second, circuit precedent put Dr. Baldwin on notice that providing "some medical care" to Dantzler would not immunize her from a deliberate-indifference claim; Dantzler "is entitled to prove his case by establishing the course of treatment, or lack thereof, so deviated from professional standards that it amounted to deliberate indifference." *Id.* (cleaned up). Thus, a prison doctor who fails to exercise "professional judgment" in making a medical care decision may be liable for deliberate indifference. *See A.H.*, 891 F.3d at 727.

Third, circuit precedent, as well as a robust consensus of cases from our sister circuits, establish that a prison official "delaying medical treatment for 'nonmedical reasons' may amount to deliberate indifference." *Cannon*, 112 F.4th at 591 (quoting *Hartsfield*, 371 F.3d at 457); *see also Morris*, 954 F.3d at 1059.[4] We acknowledge that

---

[4]Our sister circuits agree. *See, e.g.*, *Delaughter*, 909 F.3d at 138 n.7 ("We have previously suggested that a non-medical reason for delay in treatment constitutes deliberate indifference, and several of our sister circuits have held so explicitly."); *Perez*, 792 F.3d at 777 ("Deliberate indifference may occur where a prison official, having knowledge of a significant risk to inmate health or safety, . . . delays a prisoner's treatment for non-medical reasons, thereby exacerbating his pain and suffering."); *Blackmore v. Kalamazoo County*, 390 F.3d 890, 899 (6th Cir. 2004)

the "word 'may' leaves room for consideration of the specific facts and circumstances of the case." *Leonard v. St. Charles Cnty. Police Dep't*, 59 F.4th 355, 363 (8th Cir. 2023). But we have no trouble concluding that *Hartsfield* put Dr. Baldwin on notice that delaying medical treatment for the nonmedical reason of an inmate's possibility of parole would rise to the level of deliberate indifference. In *Hartsfield*, we held that evidence a prison doctor "withheld dental treatment for nonmedical reasons—[the detainee's] behavioral problems"—generated a "question of material fact . . . as to whether . . . [the jail doctor] w[as] deliberately indifferent." 371 F.3d at 457. Like the jail doctor in *Hartsfield*, Dr. Baldwin "was made aware of [Dantzler's] pain . . . , but [she] withheld [scheduling the MRI] for nonmedical reasons—[Dantzler's possibility of parole]." *Id.*

*Leonard* does not undermine our conclusion that the law was clearly established. In that case, a nurse failed to provide a pretrial detainee with medication for his mental illness and eye inflammation. 59 F.4th at 358. But once the detainee "began showing suicidal tendencies, she placed him in the Suicide Prevention Unit, which had procedures in place to prevent inmates from harming themselves." *Id.* at 363. Thus, the nurse "dealt with his psychosis," *id.* at 362, by taking a "precautionary measure[]," *id.* at 363. We compared the nurse's action to "what happened in *Dadd v. Anoka County*." *Id.* (citing *Dadd v. Anoka County*, 827 F.3d 749, 755 (8th Cir. 2016)). "There, the nurse refused to provide an inmate with a prescription painkiller following dental surgery. Later, despite knowing that he could not sleep due to the pain, she still did nothing. And even after a doctor prescribed an over-the-counter pain medication,

("When prison officials are aware of a prisoner's obvious and serious need for medical treatment and delay medical treatment of that condition for non-medical reasons, their conduct in causing the delay creates the constitutional infirmity."); *Farrow*, 320 F.3d at 1246 ("For example, a defendant who delays necessary treatment for non-medical reasons may exhibit deliberate indifference."); *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999) ("We have found 'deliberate indifference' . . . where the prison official . . . delays necessary medical treatment based on a non-medical reason . . . .").

she refused to administer it." *Id.* The "clearly established principle" that we discerned from *Dadd* "is that a *complete* failure to treat an extremely painful (or other serious) condition displays a reckless indifference to a serious medical need." *Id.* (citing *Dadd*, 827 F.3d at 757). We held that *Dadd* did not place the nurse in *Leonard* on "'fair notice' that her failure to take *further* action violated clearly established law." *Id.*

Although we distinguished *Dadd* from *Leonard* on the complete-failure-to-treat principle, that is not the only ground upon which *Leonard* is distinguishable from *Dadd.* In *Leonard*, we never said that the nurse's decision to place the pretrial detainee in the Suicide Prevention Unit to monitor his mental illness instead of giving him his medication *was not* a "medical judgment"; by contrast, in *Dadd*, the nurse's refusal to give the inmate his medication was not based on a "medical judgment" but on "indifference." *Dadd*, 827 F.3d at 756. In summary, the nurse in *Leonard* exercised medical judgment, while the nurse in *Dadd* failed to act based on a nonmedical reason—indifference. For the same reason, *Leonard* is distinguishable from the present case. Based on Dantzler's version of the facts, Dr. Baldwin delayed his MRI for a nonmedical reason (the possibility of parole) instead of based on her medical judgment.

In summary, we conclude that the law was clearly established. Crediting Dantzler's version of the facts, we hold that Dr. Baldwin was on notice that despite providing some care to Dantzler, her delay in scheduling him for an MRI based on the nonmedical reason of his possibility of parole supports a finding of deliberate indifference.

### III. *Conclusion*

We affirm the judgment of the district court.

STRAS, Circuit Judge, dissenting.

Dr. Baldwin made the wrong decision about how to treat Travis Dantzler's injured knee. But "[d]eliberate indifference is a difficult standard to meet," which is why she should receive qualified immunity "[e]ven under a plaintiff-friendly version of the facts." *Leonard v. St. Charles Cnty. Police Dep't*, 59 F.4th 355, 360–61 (8th Cir. 2023) (citations omitted). Maybe she committed medical malpractice, but the treatment she provided did not reflect a criminally reckless state of mind. *See id.* at 360.

"[T]his is not one of those cases in which there was a complete and unjustifiable lack of treatment." *Id.* at 361. Dantzler received ibuprofen and a knee brace/sleeve from the moment he reported having pain until a doctor surgically repaired his knee. Although getting the surgery took longer than it should have, criminal recklessness requires more than just being wrong about the right medical treatment. *See Phillips v. Jasper Cnty. Jail*, 437 F.3d 791, 795 (8th Cir. 2006) (holding that mere disagreement with a treatment decision is not enough); *Dulany v. Carnahan*, 132 F.3d 1234, 1240 (8th Cir. 1997) ("[A]n inmate is not entitled to any particular course of treatment.").

Even if waiting to see if Dantzler received parole crossed the constitutional line, Dr. Baldwin still did not violate a clearly established right. *See Morgan v. Robinson*, 920 F.3d 521, 523 (8th Cir. 2019) (en banc). Our cases establish only that delaying non-emergency medical care *may* be unconstitutional. *See Leonard*, 59 F.4th at 363 ("The word 'may' leaves room for consideration of the specific facts and circumstances of [each] case . . . ."). That is, "*complete[ly]* fail[ing] to treat an

-30-

extremely painful (or other serious) condition" can lead to liability. *Id.* But not treating a painful knee with ibuprofen and a brace, the right approach for the injury she thought he had. *See Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam) (requiring "fair notice" before an official loses qualified immunity).

_____